# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

------------------------------------------------------------------- x

COVENANT HEALTH SYSTEM, formerly d/b/a
ST. MARY OF THE PLAINS HOSPITAL
AND METHODIST HOSPITAL
3615 19th Street
Lubbock, Texas 79410      No. [   ]

    Plaintiff,

  v.

MICHAEL O. LEAVITT,
Secretary of the United States Department
of Health and Human Services
200 Independence Avenue, S.W.
Washington DC 20201

    Defendant

-------------------------------------------------------------------x

## COMPLAINT

  Covenant Health System (formerly d/b/a/ St. Mary of the Plains Hospital and Methodist Hospital) ("Plaintiff"), by and through its undersigned counsel, state the following in the form of this Complaint against Michael O. Leavitt, Secretary of the United States Department of Health and Human Services (the "Secretary"):

## I.    INTRODUCTION

1.    This case involves Medicare reimbursement for two hospital providers for the Medicare cost reporting periods of 1993-1997.  The providers, St. Mary of the Plains Hospital (Medicare Provider No. 45-0040) and Methodist Hospital (Medicare Provider No. 45-0457) merged in 1999 under Covenant Hospital System (Medicare Provider No. 45-0040) the Plaintiff herein (also referred to hereinafter as a "Hospital" or as the "Hospitals").   The Hospitals challenge a final decision of the Secretary, acting through the Administrator of the Centers for Medicare and Medicaid Services ("CMS") that denied certain Medicare reimbursement to the Hospitals under 42 U.S.C. §1395ww(d)(5)(F), known as the Disproportionate Share Hospital ("DSH") Statute.  This Statute directs the Secretary to make additional Medicare payments to hospitals that serve "a significantly disproportionate number of low-income patients." 42 U.S.C. §1395ww(d)(5)(F)(i)(I).   Under this Statute, the DSH calculation must include all of the Hospitals' "patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State Plan approved under subchapter Title XIX of this chapter, but who were not entitled to [Medicare Part A benefits]."   42 U.S.C. §1395ww(d)(5)(F)(vi)(II). The Secretary, acting through the Administrator of CMS, violated the provisions of the Medicare DSH Statute in his decision issued March 11, 2008, by refusing to allow the Hospitals to include in the DSH calculation those patient days related to inpatient services provided to indigent patients, or charity care, where the Texas Title XIX State Plan approved by the Secretary provides disproportionate share reimbursement to qualifying hospitals

based upon medical services provided to inpatients who have no source of payment, third party or personal resources.

The Secretary's decision, to the extent it precludes Medicare DSH payments based on patient days attributable to charity care days under the Texas Title XIX State Plan, contravenes the plain and unambiguous language of the governing Medicare statute, is inconsistent with clear Congressional intent, patently unreasonable, violative of equal protection guarantees, and is arbitrary, capricious, and otherwise contrary to law.

## II.    JURISDICTION AND VENUE

2.      This action arises under Title XVIII of the Social Security Act, 42 U.S.C. §§1395oo(f)(1), and the Administrative Procedure Act ("APA"), 5 U.S.C. §§551 et seq.

3.      This court has jurisdiction under 42 U.S.C. §1395oo(f)(1), to review a final decision of the Secretary of Health and Human Services that affirms, modifies, or reverses a decision of the Provider Reimbursement Review Board. The final decision of the Secretary was issued March 11, 2008, and received by the Plaintiff on March 14, 2008; as a result, this action is timely within the limitations periods in 42 U.S.C. §1395oo(f)(1).

4.      Pursuant to 42 U.S.C. §1395oo(f)(1), venue is proper in the United States District Court for the District of Columbia.

### III.    **PARTIES**

5.      The Hospitals, now merged under Covenant Health System, were at all relevant times health care providers located in the State of Texas that served a disproportionate share of low-income patients for the fiscal years 1993 through 1997.  At all relevant times, each of the Hospitals had Medicare provider agreements with the Secretary of Health and Human Services and were eligible to participate in the Medicare program.

6.      St. Mary of the Plains Hospital, located at Lubbock, Texas was a short-term acute care hospital assigned Medicare Provider No. 45-0040, with this action covering its fiscal years of 1993 through 1997.

7.      Methodist Hospital, located at Lubbock, Texas was a short-term acute care hospital assigned Medicare Provider No. 45-0457, with this action covering its fiscal year 1997.

8.      Defendant Michael O. Leavitt is the Secretary of the Department of Health and Human Services, 200 Independence Avenue, S.W., Washington D.C. 20201, the federal agency responsible for the administration of the Medicare and Medicaid Programs.

### IV.    **THE MEDICARE PROGRAM**

9.      Congress enacted the Medicare Program (Title XVIII of the Social Security Act) in 1965.  As originally enacted, Medicare was a public health insurance program that furnished health benefits to the aged, blind and disabled.  Over the years, the scope of benefits and covered individuals has been expanded.

10.    Among the benefits covered by Medicare are inpatient hospital services. For cost reporting years beginning prior to October 1, 1983, the Medicare Program reimbursed inpatient hospital services on a "reasonable cost" basis. 42 U.S.C. §1395f(b). Effective with cost reporting years beginning on or after October 1, 1983, Congress adopted a prospective payment system ("PPS") to reimburse most acute care hospitals, including the Hospitals herein, for inpatient operating costs. 42 U.S.C. §1395ww(d). Under PPS, hospitals are paid a fixed amount for services rendered based upon diagnosis-related groups ("DRGs"), subject to certain payment adjustments as determined by Congress or the Secretary.

11.    The Secretary has delegated much of the responsibility for administering the Medicare Program to CMS, which was formerly known as the Health Care Financing Administration (herein collectively referred to as "CMS"). The Secretary, through CMS, contracted out many of the audit and payment functions for inpatient hospital care furnished to Medicare program beneficiaries to organizations known as fiscal intermediaries. 42 U.S.C. §1395h.

12.    At the close of the fiscal year, a hospital provider of services must submit to its fiscal intermediary a cost report showing the allowable costs incurred and amounts due from Medicare for the fiscal year and the payments received from Medicare. The fiscal intermediary is required to audit the cost report and inform the hospital provider of a final determination of the amount of Medicare reimbursement through a Notice of Program Reimbursement ("NPR"). 42 C.F.R. §405.1803.

13.    A hospital provider dissatisfied with its fiscal intermediary's determination may file an appeal with an administrative body called the Provider Reimbursement Review Board ("PRRB") within 180 days of the date the provider receives the NPR.  42 U.S.C. §1395oo(a). The PRRB was established by the Social Security Amendments of 1972 (Pub. L. 92-603) as a national, independent forum for hearing and deciding payment disputes between hospital providers and their fiscal intermediaries.

14.    The decision of the PRRB is a final administrative decision, unless the Secretary, acting through the Administrator of CMS, reviews the PRRB's decision; the Administrator may reverse, affirm or modify the PRRB's decision.  42 U.S.C. §1395oo(f).

15.    A provider has the right to obtain judicial review of any final decision of the PRRB, or of any reversal, affirmance, or modification by the Secretary, by filing a civil action within 60 days of the date on which notice of any final decision by the PRRB or of any reversal, affirmance, or modification by the Secretary is received.  42 U.S.C. §1395oo(f).

## V.    **THE MEDICAID PROGRAM**

16.    Congress enacted the Medicaid program (Title XIX of the Social Security Act) in 1965. Under Title XIX of the Social Security Act, federal funds are paid to states to offset some of the expenses incurred in furnishing medical assistance to eligible low-income individuals.  See 42 U.S.C. §1396 et seq.  "Medical assistance" is defined under Title XIX of the Social Security Act to include payment of inpatient and outpatient hospital services to individuals who do not have the income and resources to pay for those services.  42 U.S.C. §1396d(a).  Only those

expenditures for medical assistance that are made under the Title XIX State Plan approved by the Secretary are eligible for matching federal payments, known as Federal Financial Participation ("FFP"). 42 U.S.C. §1396, 1396d(a) – (b).

17.    States have a substantial amount of discretion in selecting the benefits provided under its Title XIX programs. 42 U.S.C. §1396d. Nevertheless, all participating states must furnish certain minimum benefits, including inpatient hospital services. 42 U.S.C. §§1396a(a)(10)(A), 1396d(a)(1).

18.    States also have some flexibility in establishing payment rates for hospital services under its Title XIX programs. 42 U.S.C. §1396a(a)(13)(A).

19.    States that participate in the Medicaid program are required to develop a State Plan for delivery of medical assistance and submit it to the Secretary for approval. 42 U.S.C. §1396. The State Plan must comply with certain requirements of the Medicaid statute set forth in 42 U.S.C. §1396a to be approved. Once the State Plan is approved, the state is eligible to receive FFP for furnishing covered items and services under that State Plan. For any given year, the amount of the FFP payment cannot be less than 50% of the cost of covered expenditures under the State Plan.

20.    The State of Texas, at all relevant times referred to in this Complaint, had a valid Title XIX State Plan approved by the Secretary.

## VI.     THE TEXAS CHARITY CARE PROGRAMS

21.     The Texas Title XIX State Plan provides for payments to qualified hospitals for inpatient services provided to indigent patients under charity care plans through the State's Medicaid Disproportionate Share Hospital Reimbursement Program.   Exhibit "A" attached hereto is a copy of the relevant portion of the approved Texas Title XIX State Plan in effect for the period after September 1, 1993, through the 1997 cost reporting periods for the Hospitals.

22.     The State of Texas implemented its Medicaid Disproportionate Share Hospital Reimbursement Program as part of its Title XIX State Plan as required by federal law. Beginning September 1, 1993, the Title XIX State Plan was amended to measure and provide reimbursement for inpatient charity care provided by qualified hospitals.  Pursuant to the terms of the amended Title XIX State Plan, the State identifies and reimburses those hospitals that provide a disproportionate share of inpatient care to indigent patients.  A qualifying hospital must submit its criteria and procedure for identifying patients who qualify for charity care to the State for approval.  Although the hospitals have flexibility in designing their charity care policy, there are minimum criteria that must be met to be approved at the state and federal level.

23.     The Hospitals implemented charity care policies and reported the charity care they provided in an annual survey report filed with the State.

24.     Having a charity care policy and providing charity care pursuant to that policy are conditions of participation for hospitals to be eligible to receive reimbursement for that charity care.  However, the Hospitals did not always qualify to receive payment for charity care services

provided.  Although at all relevant times after September 1, 1993, the Hospitals provided medical assistance to the indigent, low-income population pursuant to the provisions of the approved Title XIX State Plan, they did not always provide the minimum level of care necessary to meet the mathematical threshold needed to receive the Medicaid Disproportionate Share Hospital Reimbursement.

25.    The State of Texas claims and receives FFP for the inpatient services provided pursuant to charity care policies of the hospitals, as provided in the approved Title XIX State Plan.  The payment of FFP to the State of Texas is based upon a matching of state dollars and having an approved Title XIX State Plan regarding how those funds will be allocated for services provided by the State's hospitals to low-income patients.

## VII.    THE MEDICARE DISPROPORTIONATE SHARE PAYMENT ADJUSTMENT

26.    In 1986, Congress amended Title XVIII of the Social Security Act to require the Secretary to make additional payments to hospitals that serve "a significantly disproportionate number of low-income patients . . . ." 42 U.S.C. §1395ww(d)(5)(F)(i)(I).  Eligibility for these "disproportionate share" (DSH) payments, and the level of these payments, is based on the calculation of a "disproportionate share percentage" that considers the number of low-income patients a hospital serves.  See 42 U.S.C. §§1395ww(d)(5)(F)(v) and (vi).

27.    To be eligible for the DSH payment, a hospital must meet certain criteria, including a disproportionate patient percentage that exceeds a specified threshold.  The amount of the DSH adjustment then depends upon the extent to which the disproportionate patient

percentage exceeds the threshold. The disproportionate patient percentage is defined as the sum of two fractions expressed as a percentage for a hospital's cost reporting period. These fractions are often referred to as the "Medicare Low-Income Proxy" and the "Medicaid Low-Income Proxy", respectively, and are defined as follows:

(I)   The fraction (expressed as a percentage) the numerator of which is the hospital's patient days for such period which were made up of patients who (for such dates) were entitled to benefits under Part A of this Title and were entitled to supplemental security income benefits (excluding any state supplementation) under Title XVI of this Act and the denominator of which is the number of such hospital's patient days for such fiscal year which were made up of patients who (for such days) were entitled to benefits under Part A of this Title.

. . .

(II)   The fraction (expressed as a percentage), the numerator of which is the number of the hospital's patient days for such period which consists of patients who (for such days) were eligible for medical assistance under a State plan approved under Title XIX of this chapter, but who were not entitled to benefits under Part A of this Title, and the denominator of which is the total number of the hospital patient days for such period.

42 U.S.C. §1395ww(d)(5)(F)(vi).

28.   It is only the "Medicaid Low-Income Proxy" portion of the formula for calculating the DSH adjustment that is at issue in this action. The larger the number of patient days for patients who are "eligible for medical assistance under a State Plan approved under subchapter XIX," the larger the DSH adjustment for the provider.

29.   Eligibility for Medicaid for purposes of the DSH formula is further defined in 42

C.F.R. §412.106(b)(4) by referencing eligibility for medical assistance under an approved

Medicaid State Plan is as follows:

> Second computation.   The fiscal intermediary determines, for the same
> cost reporting period used for the first computation, the number of the hospital's
> patient days of service for which patients were eligible for Medicaid but not
> entitled to Medicare Part A, and divides that number by the total number of
> patient days in the same period.   For purposes of this second computation, the
> following requirements apply:
>
> (i)      For purposes of this computation, a patient is deemed eligible for
> Medicaid on a given day only if the patient is *eligible for inpatient hospital
> services under an approved State Medicaid plan* or under a waiver authorized
> under Section 1115(a)(2) of the Act on that day, regardless of whether particular
> items or services were covered or paid under the State plan or the authorized
> waiver.
>
> (ii)     The hospital has the burden of furnishing data adequate to prove
> eligibility for each Medicaid patient day claimed under this paragraph, and of
> verifying with the state that a patient was eligible for Medicaid during each
> claimed patient hospital day.

(emphasis added)

30.   The term "State plan" is defined at 42 C.F.R. §430.10 as:

A comprehensive written statement submitted by the agency describing the nature and scope of

its Medicaid program and giving assurance that it will be administered in conformity with the

specific requirements of Title XIX, the regulations of this Chapter IV and other applicable

official issuances of the Department.   The State plan contains all information necessary for CMS

to determine whether the plan can be approved to serve as the basis for Federal Financial

Participation (FFP) in the State Program.

31.     In computing Plaintiff's Medicare DSH adjustments for the fiscal years covered in this Complaint, the Medicare Fiscal Intermediary refused to allow the patient days associated with services provided by the Plaintiff Hospitals to patients pursuant to the Hospitals' charity care policies.  Excluding those days reduced the Plaintiff's DSH percentages, and reduced the amount of Medicare reimbursement the Plaintiff was paid.   Plaintiff timely appealed the exclusion of the charity care days from the Medicaid Low-Income Proxy to the PRRB.

## VIII.   THE HOSPITALS' ADMINISTRATIVE APPEALS

32.     An Initial Request for Hearing—Group Appeal was filed with the PRRB and assigned Case No. 00-1904G.  A hearing was held on June 15, 2007, before the PRRB to determine whether the Fiscal Intermediary determined the Hospitals' Medicare  Disproportionate Share payments in accordance with 42 U.S.C. §1395ww(d)(5)(F)(vi)(II).  This appeal focused on the issue of whether or not certain charity care or indigent care days related to patients who received medical assistance pursuant to the Texas State Plan under Title XIX must be included in the calculation of the Hospitals' DSH payments.  Plaintiff provided documentation to the Fiscal Intermediary in support of the actual charity care or indigent care patient days claimed. It was not necessary or appropriate to offer this detailed documentation into the record for the PRRB. The PRRB was asked only to resolve the issue of the "type of days" to be included in the calculation of the Plaintiff's DSH payment.

33.     On January 11, 2008, the PRRB issued its decision, finding that "although the patients in the charity care program did not qualify for Medicaid under Section 1901 of the Social

Security Act, the patients do qualify for medical assistance under a State approved plan as these programs are included in the State approved plan." The Board found that the purpose of the Medicare DSH Statute is to compensate hospitals for the additional costs associated with treating low-income patients and determined that the plain language of the statute requires all days attributable to patients eligible for medical assistance under the State Plan approved under Title XIX be included in the Medicaid proxy. The PRRB rejected the Fiscal Intermediary's argument that the Medicaid Low-Income Proxy is limited to Medicaid eligibility under Section 1901 of the Social Security Act (the Medically Needy and the Categorically Needy). However, the PRRB affirmed the Fiscal Intermediary's adjustments which excluded the charity care days, solely because the PRRB found the Hospitals did not provide adequate documentation or evidence of the number and specific charity care days being claimed. A copy of the PRRB's decision is attached hereto as Exhibit "B".

34. The CMS Administrator decided to review the PRRB's decision. In a Decision dated March 11, 2008, the Administrator of CMS, acting on behalf of the Secretary, affirmed the decision of the PRRB. The Administrator's decision is the final decision of the Secretary. A copy of the Administrator's decision is attached hereto as Exhibit "C".

## COUNT I

## THE SECRETARY'S FINAL DECISION IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE AND IS CONTRARY TO LAW

35.     Plaintiff realleges and incorporates by reference Paragraphs 1 through 34 as if fully set forth at length below.

36.     The Secretary's decision issued March 11, 2008, refusing to allow the Plaintiff Hospitals to include the patient days associated with medical assistance provided to low-income charity care patients for purposes of determining the Hospitals' Medicare Disproportionate Share payments, is unlawful because it conflicts with Congressional intent, as reflected in the Statute's plain meaning and its legislative history.  Under the DSH Statute, as long as a patient is eligible for medical assistance under a State Plan approved under Title XIX of the Social Security Act, for a particular day for which he or she receives inpatient hospital services, that day must be counted as a Medicaid day for purposes of the Medicare DSH payment.  The DSH Statute does not permit the Secretary's interpretation and application in this case.

37.     Likewise, the legislative history demonstrates the clear meaning of the Statute, which conflicts with the Secretary's construction and application to the Plaintiff.  The purpose of the Medicare disproportionate share payment is to compensate hospitals for the additional cost incurred to furnish care to low-income persons.  The Medicaid portion of the disproportionate share percentage was adopted as a proxy measure for all low-income patients served by a hospital.  The fact that a patient meets the low-income eligibility standards under an approved

Title XIX State Plan certifies the patient's low-income status. The Secretary's construction and application to the Hospitals defeats this purpose.

38.     Plaintiff is entitled to have this court hold unlawful and set aside the decision issued March 11, 2008, by the Administrator of CMS as patently unreasonable, arbitrary, capricious, and contrary to the DSH Statute and binding case law as provided in 42 U.S.C. §1395oo(f)(1).

<u>**COUNT II**</u>

**THE HOSPITALS ARE ENTITLED TO A DECLARATION
THAT ALL CALCULATIONS OF THEIR MEDICARE
REIMBURSEMENT UNDER THE MEDICARE DSH STATUTE
INCLUDES INPATIENT DAYS ATTRIBUTABLE TO PATIENTS
RECEIVING BENEFITS UNDER THE TEXAS CHARITY CARE PROGRAMS**

39.     Plaintiff realleges and incorporates by reference Paragraphs 1 through 38 as if fully set forth at length below.

40.     An actual case or controversy exists under 28 U.S.C. §2201, <u>et seq.</u> as to whether Texas charity care inpatient days should be included in the Medicare DSH calculation for the Plaintiff Hospitals.

41.     The plain language of 42 U.S.C. §1395ww(d)(5)(F)(vi) requires that all days relating to patients eligible for medical assistance under a State Plan approved by the Secretary be included in the Medicaid proxy calculation.

42.    No authority in Title XIX limits the scope of days to be included in the Medicaid proxy calculation in 42 U.S.C. §1395ww(d)(5)(F)(vi) to individuals who qualify for benefits under Section 1901 of the Social Security Act.

43.    The Secretary's exclusion of the charity care days under the approved Texas Medicaid State Plan from the calculation of the Medicaid proxy is arbitrary, capricious, and otherwise not in accordance with the law.

44.    Plaintiff, therefore, is entitled to a binding declaration that inpatient days attributable to individuals receiving benefits under the Texas charity care programs must be included in all calculations of each Hospital's Medicare DSH reimbursement under 42 U.S.C. §1395ww(d)(5).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests relief as follows:

(1)     That this Court hold unlawful and set aside the decision issued March 11, 2008, by the Administrator of CMS, which refused to allow hospital inpatient days associated with the Texas charity care programs to be included in the Medicare DSH calculation for the Plaintiff Hospitals.

(2)     A declaration by the Court that the decision issued March 11, 2008, by the Administrator of CMS violates 42 U.S.C. §1395ww(d)(5)(F)(vi).

(3)     A declaration by the Court that the Secretary's application of 42 C.F.R. §412.106(b)(4) to Plaintiff is unlawful in so far as it excludes charity care hospital patient days from the Plaintiff's DSH calculation in contravention of the plain meaning of 42 U.S.C. §1395ww(d)(5)(F)(vi), is otherwise arbitrary, capricious, unreasonable, unlawful and invalid.

(4)     An order requiring that the Secretary, within 90 days of receipt of Plaintiff's documentation, (i) to recalculate Plaintiff's Medicare disproportionate patient percentage for the fiscal years identified herein, based upon the foregoing, and based upon the information submitted by Plaintiff with respect to all patient days for which a patient was eligible for medical assistance pursuant to a State Plan approved under Title XIX and (ii) pay to Plaintiff the additional amounts due under the resulting DSH recalculation, plus interest in accordance with 42 U.S.C. §1395oo(f)(2).

(5)    A declaration that this Court shall retain jurisdiction in this matter until the Secretary's recalculation of Plaintiff's Medicare DSH percentages and subsequent payment to Plaintiff of the additional amounts due is complete, including the additional amounts based upon the inclusion of charity care hospital patient days.

(6)    Attorney's fees, interest and costs of suit incurred by Plaintiff as permitted by law.

(7)    Such other and further relief as this Court deems just and equitable.

Dated this 12th day of May, 2008.


                                    EPSTEIN BECKER & GREEN, P.C.

                        By:    _____
                                    George B. Breen (D.C. Bar # 428665)
                                    Robert E. Wanerman (D.C. Bar # 456895)
                                    Epstein Becker & Green, P.C.
                                    1227 25th Street, NW, Suite 700
                                    Washington D.C. 20037-1175
                                    202-861-0900

                                    ATTORNEYS FOR PLAINTIFF

JS-44
(Rev.1/05 DC)

**CIVIL COVER SHEET**

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Covenant Health System, formerly d/b/a St. Mary of the Plains Hospital and Methodist Hospital | Michael O. Leavitt |

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  88888
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)  11001
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
George B. Breen, Robert E. Wanerman, Epstein Becker & Green, P.C., 1227 25th Street, NW, Suite 700, Washington, DC 20037, (202)861-0900

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

O 1 U.S. Government Plaintiff

● 3 Federal Question
(U.S. Government Not a Party)

O 2 U.S. Government Defendant

O 4 Diversity
(Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | O 1 | O 1 | Incorporated or Principal Place of Business in This State | O 4 | O 4 |
| Citizen of Another State | O 2 | O 2 | Incorporated and Principal Place of Business in Another State | O 5 | O 5 |
| Citizen or Subject of a Foreign Country | O 3 | O 3 | Foreign Nation | O 6 | O 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

**O A. Antitrust**

☐ 410 Antitrust

**O B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

**● C. Administrative Agency Review**

☐ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☒ 890 Other Statutory Actions (If Administrative Agency is Involved)

**O D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

**O E. General Civil (Other)     OR     O F. Pro Se General Civil**

Real Property
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

Personal Property
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

Bankruptcy
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

Property Rights
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

Federal Tax Suits
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

Other Statutes
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ◎ **G.** *Habeas Corpus/ 2255* | ◎ **H.** *Employment Discrimination* | ◎ **I.** *FOIA/PRIVACY ACT* | ◎ **J.** *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans<br>(excluding veterans) |

| ◎ **K.** *Labor/ERISA (non-employment)* | ◎ **L.** *Other Civil Rights (non-employment)* | ◎ **M.** *Contract* | ◎ **N.** *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding   ◎ 2 Removed from State Court   ◎ 3 Remanded from Appellate Court   ◎ 4 Reinstated or Reopened   ◎ 5 Transferred from another district (specify)   ◎ 6 Multi district Litigation   ◎ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

42 U.S.C. Section 1395oo(f)(1), and 5 U.S.C. Sections 551 et seq. Judicial review of a final decision of the Provider Reimbursement Review Board

**VII. REQUESTED IN COMPLAINT**   ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   DEMAND $ [_____]   Check YES only if demanded in complaint

JURY DEMAND:   YES ☐   NO ☒

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES ☐   NO ☒   If yes, please complete related case form.

DATE   5/12/08   SIGNATURE OF ATTORNEY OF RECORD   *[signature]*

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.   RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

# EXHIBIT A

Appendix I to Attachment 4.19-A

### State of Texas Disproportionate Share Hospital Reimbursement Program for Hospitals Other Than State-Owned Teaching Hospitals

The single state agency has developed a method of identifying Medicaid disproportionate share hospitals, excluding state-owned teaching hospitals which qualify for the disproportionate share hospital program for state-owned teaching hospitals, and formulas to reimburse them for their cost of treating indigent patients.

(a) Prior to the beginning of each state fiscal year, which starts September 1, the single state agency surveys Texas' Medicaid hospitals to determine which hospitals meet the state's conditions of participation.

(1) The state identifies and reimburses those hospitals that provide a disproportionate share of inpatient care to indigent patients. Qualifying hospitals return completed surveys, giving evidence of nonrestrictive eligibility policies for state approval. A qualifying hospital must submit its criteria and procedures for identifying patients who qualify for charity care to the state for approval. The policy for charity care must be posted prominently, in English and Spanish, and all patients must be advised of the availability of charity care and the procedures for applying.

(2) Each hospital must have a Medicaid inpatient utilization rate as defined in §1923(b)(2), at a minimum, of one percent in accordance with §§1923(d)(3) and 1923(e)(2)(C) of the Social Security Act.

(3) To qualify for disproportionate share payments, each hospital must have at least two physicians (M.D. or D.O.), with staff privileges at the hospital, who have agreed to provide nonemergency obstetrical services to Medicaid clients. The two-physician requirement does not apply to hospitals whose inpatients are predominantly under 18 years old or that did not offer nonemergency obstetrical services to the general population as of December 22, 1987.

(b) For purposes of this state plan:

(1) Total Medicaid inpatient days means the total number of billed Title XIX inpatient days based on the latest available state fiscal year data for patients eligible for Title XIX benefits. Total Medicaid inpatient days includes days that were denied payment for reasons other than eligibility. Included are inpatient days of care provided to patients eligible for Medicaid at the time the service was provided, regardless of whether the claim was paid. Examples of these denied claims include, but are not limited to, claims for patients whose spell of illness limits are exhausted, or claims that were filed late. The term excludes days attributable to Medicaid patients between the ages of 21 and 65 who live in an institution for mental diseases. The term includes days attributable to individuals eligible for Medicaid in other states.

STATE _Texas_
DATE REC'D AUG 1 0 1995
DATE APPV'D APR 1 8 1996
DATE EFF SEP 0 1 1995

A



(2) Total inpatient census days means the total number of a hospital's inpatient census days during its fiscal year ending in the previous calendar year.

(3) Total Medicaid inpatient hospital payments means the total amount of Title XIX funds, excluding Medicaid disproportionate share funds, a hospital received for admissions during the latest available state fiscal year for inpatient services.

(4) Total operating costs means the total operating costs of a hospital during its fiscal year ending in the calendar year before the start of the federal fiscal year, according to the hospital's Medicare cost report (tentative, or final audited cost report, if available).

(5) Total state and local revenue means the total amount of state and local revenue a hospital received for inpatient care, excluding all Title XIX payments, during its fiscal year ending in the previous calendar year.

(6) Gross inpatient revenue means the amount of gross inpatient revenue (charges) reported by the hospital in the appropriate part of the Medicare cost report it submitted for its fiscal year ending in the previous calendar year.

(7) Total inpatient charity charges, excluding bad debt charges, means the total amount of the hospital's charges for inpatient hospital services attributed to charity care (care provided to individuals who have no source of payment, third-party or personal resources) in a cost reporting period. The total inpatient charges attributable to charity care does not include contractual allowances and discounts (other than for indigent patients not eligible for medical assistance under an approved Medicaid State Plan); that is, reduction or discounts, in charges given to other third-party payers such as but not limited to HMOs, Medicare, or Blue Cross.

(8) A rural area is defined as an area outside a Metropolitan Statistical Area (MSA) as defined by the Office of Management and Budget.

(9) Cost of services to uninsured patients are the inpatient and outpatient charges to patients who have no health insurance or other source of third party payment for services provided during the year, multiplied by the hospital's ratio of costs to charges (inpatient and outpatient), less the amount of payments made by or on behalf of those patients. Uninsured patients are patients who have no health insurance or other source of third party payments for services provided during the year. Uninsured patients include those patients who do not possess health insurance that would apply to the service for which the individual sought treatment.

(10) Hospital specific limit is the sum of the following two measurements: (a) Medicaid shortfall; and (b) cost of services to uninsured patients.

(11) Medicaid shortfall is the cost of services (inpatient and outpatient) furnished to Medicaid patients, less the amount paid under the nondisproportionate share hospital payment method under this state plan.

(12) Cost-to-charge ratio (inpatient only) is the hospital's overall inpatient cost-to-charge ratio, as determined from its Medicare cost report submitted for the fiscal year ending in the previous calendar year. The latest available Medicare cost report is used in the absence of the cost report for the hospital's fiscal year ending in the previous calendar year.

(13) Cost-to-charge ratio (inpatient and outpatient) is the hospital's overall cost-to-charge ratio, as determined from its Medicare cost report submitted for the fiscal year

ending in the previous calendar year. The latest available Medicare cost report is used in the absence of the cost report for the hospital's fiscal year ending in the previous calendar year.

(14) Gross inpatient revenue is the amount of gross inpatient revenue (charges) reported by the hospital in the appropriate part of the Medicare cost report submitted for the fiscal year ending in the previous calendar year. The latest available Medicare cost report is used in the absence of the cost report for the hospital's fiscal year ending in the previous calendar year.

(15) Adjusted hospital specific limit is a hospital specific limit trended forward to account for the inflation update factor since the base year.

(16) Bad debt charges are uncollectible inpatient and outpatient charges that result from the extension of credit. For purposes of Appendix 1, "bad debt charges" are used in the calculation of charges attributed to uninsured patients as defined in (b)(9), and are used only in the limited circumstances described in (g)(2).

(17) Inflation update factor is a general increase in prices as determined by the state. For additional information concerning the inflation update factor, see §(n)(2), page 8 of the Methods and Standards for Establishing Payment Rates—Inpatient Services, of this state plan.

(18) Medicaid inpatient utilization rate is the rate defined in §1923(b)(2) of the Social Security Act.

(19) Payments received from uninsured patients are those payments received from or on behalf of uninsured patients as defined in (b)(9).

(20) Charity charges are the total amount of hospital charges for inpatient and outpatient services attributed to charity care in a cost reporting period. These charges do not include bad debt charges, contractual allowances or discounts (other than for indigent patients not eligible for medical assistance under an approved Medicaid state plan); that is, reductions or discounts in charges given to other third party payers such as, but not limited to, health maintenance organizations, Medicare, or Blue Cross. Charity charges are used in the calculation of charges attributed to uninsured patients as defined in (b)(9), only in the limited circumstances described in (g)(2).

(21) Allowable cost is defined by the state using the same methods and procedures that are reflected in both the inpatient and outpatient sections of the currently approved state plan.

(22) Available fund for state mental and chest hospitals is the sum of 100 percent of their adjusted hospital specific limits.

(23) Available fund for the remaining hospitals is the total federal fiscal year cap (state disproportionate share hospital allotment) minus the available fund for state teaching hospitals minus the available fund for state mental and chest hospitals.

(c) The single state agency identifies the qualifying Medicaid disproportionate share providers from among the hospitals that meet the state's conditions of participation using the following formulas. Children's hospitals that meet all the requirements in (a) but do not otherwise qualify as disproportionate share hospitals are deemed disproportionate share hospitals.

STATE _Texas_
DATE  AUG 1 0 1995
        APR 1 8 1996
        SEP 0 1 1995
HCFA __

A

Appendix I to Attachment 4.19-A
Page 4

(1) A Medicaid inpatient utilization rate at least one standard deviation above the mean Medicaid inpatient utilization rate for all hospitals participating in the Medicaid program;

Title XIX Inpatient Days
Total Inpatient Census Days

OR

(2) For rural hospitals, a Medicaid inpatient utilization rate greater than the mean Medicaid inpatient utilization rate for all hospitals participating in the Medicaid program;

OR

(3) A low income utilization rate exceeding 25 percent. For a hospital, the low income utilization rate is the sum (expressed as a percentage) of the fractions calculated as follows:

(A) Total Medicaid inpatient payments paid to the hospital, plus the amount of revenue received directly from state and local governments, excluding all Title XIX payments, in a cost reporting period, divided by the total amount of revenues of the hospital for inpatient services (including the amount of state and local revenue) in the same cost reporting period multiplied by the hospital's inpatient cost to charge ratio for the same cost reporting period;

Title XIX inpatient hospital payments + Total state/local revenue
Gross Inpatient Revenue * Inpatient Cost to Charge Ratio

AND

(B) Total amount of the hospital's charges for inpatient hospital services attributable to charity care (care provided to individuals who have no source of payment, third-party or personal resources), excluding bad debt charges, in a cost reporting period, minus the amount of revenue for inpatient hospital services received directly from state and local governments, excluding all Title XIX payments, in a cost reporting period, divided by the total amount of the hospital's charges for inpatient services in the hospital in the same period. The total inpatient charges attributable to charity care does not include contractual allowances and discounts (other than for indigent patients not eligible for medical assistance under an approved Medicaid State Plan); that is, reductions or discounts in charges given to other third-party payers such as but not limited to HMOs, Medicare, or Blue Cross.

Total inpatient charity charges - Total state/local revenue
Gross Inpatient Revenue

OR

STATE _Texas_
DATE REC'D _AUG 1 0 1995_
DATE APP'D _APR 1 8 1996_
DATE EFF _SEP 0 1 1995_
HCFA 179 _93-17_

A

SUPERSEDES: TN • _93-02_

(4) Total Medicaid inpatient days at least one standard deviation above the mean Medicaid inpatient days for all hospitals participating in the Medicaid program.

(d) The single state agency determines Medicaid disproportionate share status in the following ways:

(1) The single state agency arrays each hospital's Medicaid inpatient utilization rate in descending order. The single state agency first selects hospitals, meeting the requirements in (a) above, whose Medicaid inpatient utilization rates are at least one standard deviation above the mean Medicaid inpatient utilization rate for all hospitals participating in the Medicaid program. The state considers these hospitals to be Medicaid disproportionate share hospitals.

(2) The single state agency arrays each rural hospital's Medicaid inpatient utilization rate in descending order. The single state agency then selects rural hospitals, meeting the requirements in (a) above, whose Medicaid inpatient utilization rate is above the mean Medicaid inpatient utilization rate for all hospitals participating in the Medicaid program. The state considers these hospitals to be Medicaid   disproportionate share hospitals.

(3) The single state agency then arrays each remaining hospital's low income utilization rate in descending order. The single state agency selects hospitals, meeting the requirements in (a) of this state plan, whose low income utilization rates are greater than 25 percent. The state considers these hospitals to be Medicaid disproportionate share hospitals.

(4) Finally, the single state agency arrays each remaining hospital's total Medicaid inpatient days in descending order. The single state agency selects hospitals, meeting the requirements in (a) of this state plan, whose total inpatient Medicaid days is at least one standard deviation above the mean Medicaid inpatient days for all hospitals participating in the Medicaid program. The state considers these hospitals to be Medicaid disproportionate share hospitals.

(e) The single state agency then reimburses Medicaid disproportionate share hospitals on a monthly basis. Monthly payments equal one-twelfth of annual payments unless it is necessary to adjust the amount because payments are not made for a full 12-month period, to comply with the annual state disproportionate share hospital allotment, or to comply with other state or federal disproportionate share hospital program requirements.

Prior to the start of the next state fiscal year, the single state agency determines the size of the available funds to reimburse disproportionate share hospitals for the next state fiscal year, which begins each September 1. The funds available to reimburse the state chest hospitals and state mental hospitals equal the total of their adjusted hospital specific limits. The available fund for the remaining hospitals equals the lesser of the funds remaining in the state's annual disproportionate share hospital allotment or the sum of qualifying hospitals' adjusted hospital specific limits.

STATE _Texas_

AUG 1 0 1995
APR 1 8 1996
SEP 0 1 1995

A

SUPERSEDES  TN  _93-0.2_

Payments are made in the following manner, unless the state determines the hospital's proposed reimbursement has exceeded its adjusted hospital specific limit:

(1) A state chest hospital (facility of the Texas Department of Health) or a state mental hospital (facility of the Texas Department of Mental Health and Mental Retardation) that meets the requirements for disproportionate share status and provides inpatient psychiatric care or inpatient hospital services receives annually 100 percent of its adjusted hospital specific limit.

(2) For the remaining hospitals, payments are based on both weighted inpatient Medicaid days and weighted low income days. The single state agency weights each hospital's total inpatient Medicaid days by the appropriate weighting factor. The state defines a low income day as a day derived by multiplying a hospital's total inpatient census days from its fiscal year ending in the previous calendar year by its low income utilization rate. Hospital districts and city/county hospitals with greater than 250 licensed beds in the state's largest MSAs would receive weights based proportionally on the MSA population according to the 1990 United States census. MSAs with populations greater than or equal to 150,000, according to the 1990 census, are considered as the "largest MSAs." Children's hospitals also receive weights because of the special nature of the services they provide. All other hospitals receive weighting factors of 1.0. The inpatient Medicaid days of each hospital are based on the latest available state fiscal year data for patients entitled to Title XIX benefits. The available fund is divided into two parts. Two-thirds of the available fund reimburse each qualifying hospital on a monthly basis by its percent of the total inpatient Medicaid days. One-third of the available fund reimburses each qualifying hospital by its percent of the total low income days.

Reimbursement for the remaining hospitals is determined monthly as follows:

(1) The single state agency determines the average monthly number of weighted Medicaid inpatient days and weighted low income days of each qualifying hospital.

(2) A qualifying hospital receives a monthly disproportionate share payment based on the following formula:

$$\left(\frac{2}{3} * \text{Available Fund for Remaining Hospitals} * \frac{\text{Hospital's Avg. Mo. Title XIX Days} * \text{Weight}}{\text{Total Avg. Mo. Weighted Medicaid Days}}\right)$$

+

$$\left(\frac{1}{3} * \text{Available Fund for Remaining Hospitals} * \frac{\text{Hospital's Avg. Mo. Low Income Days} * \text{Weight}}{\text{Total Avg. Mo. Weighted Low Income Days}}\right)$$

STATE _____ Texas
DATE REC'D  AUG 1 0 1995
DATE        APR 1 2 1996
DATE        SEP 0 1 1995
HCFA 179    95-19

A

SUPERSEDES. TN _ 93-021



(f) The specific weights for certain hospital districts and children's hospitals are as follows:

·(1) Children's hospitals are weighted at 1.25.
(2) MSAs with populations greater than or equal to 150,000 and less than 300,000 are weighted at 2.25.
(3) MSAs with populations greater than or equal to 300,000 and less than 1,000,000 are weighted at 2.50.
(4) MSAs with populations greater than or equal to 1,000,000 and less than 3,000,000 are weighted at 2.75.
(5) MSAs with populations greater than or equal to 3,000,000 are weighted at 3.25

All MSA population data are from the 1990 United States census.

(g) The state or its designee determines the hospital specific limit for each disproportionate share hospital. This limit is the sum of a hospital's Medicaid shortfall, as defined in (b)(11), and its cost of services to uninsured patients, as defined in (b)(9), multiplied by the appropriate inflation update factor, as provided for in (h).

(1) The Medicaid shortfall includes total Medicaid billed charges and any Medicaid payment made for the corresponding inpatient and outpatient services delivered to Texas Medicaid clients, as determined from the hospital's fiscal year claims data, regardless of whether the claim was paid. Examples of these denied claims include, but are not limited to, patients whose spell of illness claims were exhausted, or payments were denied due to late filing. (See definition for "Medicaid shortfall.")

The total Medicaid billed charges for each hospital are converted to cost, utilizing a calculated cost-to-charge ratio (inpatient and outpatient). The state or its designee determines that ratio by using the hospital's Medicare cost report that was submitted for the fiscal year ending in the previous calendar year. The state or its designee uses the latest available Medicare cost report in the absence of the Medicare cost report submitted in the fiscal year ending in the previous calendar year. To determine the cost-to-charge ratio (inpatient and outpatient) for each hospital, the state or its designee uses the total cost from Worksheet B, Part I, Column 25 and total charges from Worksheet C Part I, Column 6. The ratio is the total cost divided by the total gross patient charges.

· (2) The state or its designee determines the cost of services to patients who have no health insurance or source of third party payments for services provided during the fiscal year for each hospital. Hospitals are surveyed each year to determine charges that can be attributed to patients without insurance or other third party resources. The charges from reporting hospitals are multiplied by each hospital's cost-to-charge ratio (inpatient and outpatient) to determine the cost.

Hospitals that do not respond to the survey, or that are unable to determine accurately the charges attributed to patients without insurance, shall have their bad debt charges

**EXHIBIT B**



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
**PROVIDER REIMBURSEMENT REVIEW BOARD**
2520 Lord Baltimore Drive, Suite L
Baltimore MD 21244-2670
Phone: 410-786-2671          FAX: 410-786-5298
Internet: www.cms.hhs.gov/PRRBReview

Suzanne Cochran, Esq., Chairperson
Elaine Crews Powell, CPA
Anjali Mukchandani-West, CPA
Yvette C. Hayes
Michael D. Richards, CPA

Refer to: Case No.: 00-1904G
Decision No.: 2008-D13

JAN 1 1 2008



RECEIVED

JAN 1 6 2008

SHERMAN LAW OFFICE, PLLC

**CERTIFIED MAIL**

Ms. Teresa A. Sherman
Sherman Law Office PLLC
1212 N. Washington
Suite 210
Spokane, WA 99201

RE: Covenant Health System 91, 93-97 DSH/Medicaid Proxy Group
Provider Nos.: Various
FYEs - 06/30/1991; 06/30/1993 through 06/30/1997

Dear Ms. Sherman:

A copy of the Provider Reimbursement Review Board's decision on the above-referenced appeal is enclosed. Please see enclosure for review and appeal information.

If you have any questions, please call (410) 786-2671.

Sincerely,

Paul J. Crofton, Director
Division of Hearings and Decisions

5 Enclosures
Final Decision Review and Appeal Information
Decision
42 USC 139500(f)
42 CFR 405.1875 and 405.1877

# PROVIDER REIMBURSEMENT REVIEW BOARD DECISION

## 2008-D13

**PROVIDER –**
Covenant Health System 91, 93-97
DSH/Medicaid Proxy Group

Provider Nos.: Various

**vs.**

**INTERMEDIARY –**
Mutual of Omaha Insurance Company

**DATE OF HEARING –**
June 15, 2007

**Cost Reporting Periods Ended –**
June 30, 1991;
June 30, 1993 through June 30, 1997

**CASE NO.: 00-1904G**

## INDEX

| | Page No. |
|---|---|
| Issue | 2 |
| Medicare Statutory and Regulatory Background | 2 |
| Statement of the Case and Procedural History | 3 |
| Jurisdictional Challenge – Parties' Contentions | 3 |
| Jurisdictional Challenge – Board Conclusion | 4 |
| Parties' Contentions | 4 |
| Findings of Fact, Conclusions of Law and Discussion | 6 |
| Decision and Order | 8 |

ISSUE:

Whether the Intermediary's calculation of the disproportionate share hospital (DSH) payment was proper.

MEDICARE STATUTORY AND REGULATORY BACKGROUND:

This is a dispute over the amount of Medicare reimbursement due a provider of medical services.

The Medicare program was established to provide health insurance to the aged and disabled. 42 U.S.C. §§1395-1395cc. The Centers for Medicare and Medicaid Services (CMS), formerly the Health Care Financing Administration (HCFA), is the operating component of the Department of Health and Human Services (DHHS) charged with administering the Medicare program. CMS' payment and audit functions under the Medicare program are contracted out to insurance companies known as fiscal intermediaries. Fiscal intermediaries determine payment amounts due the providers under Medicare law and under interpretive guidelines published by CMS. See, 42 U.S.C. §1395h, 42 C.F.R. §§413.20(b) and 413.24(b).

At the close of its fiscal year, a provider must submit a cost report to the fiscal intermediary showing the costs it incurred during the fiscal year and the portion of those costs to be allocated to Medicare. 42 C.F.R. §413.20. The fiscal intermediary reviews the cost report, determines the total amount of Medicare reimbursement due the provider and issues the provider a Notice of Program Reimbursement (NPR). 42 C.F.R. §405.1803. A provider dissatisfied with the intermediary's final determination of total reimbursement may file an appeal with the Provider Reimbursement Review Board (Board) within 180 days of the issuance of the NPR. 42 U.S.C. §1395oo(a); 42 C.F.R. §405.1835.

The operating costs of inpatient hospital services are reimbursed by Medicare primarily through the Prospective Payment System (PPS). The PPS statute contains a number of provisions that adjust reimbursement based on hospital-specific factors. See, 42 U.S.C. §1395ww(d)(5). This case involves the hospital-specific disproportionate share adjustment. The "disproportionate share hospital," or "DSH" adjustment, requires the Secretary to provide increased PPS reimbursement to hospitals that serve a "significantly disproportionate number of low-income patients." 42 U.S.C. §1395ww(d)(5)(F)(i)(I). Whether a hospital qualifies for the DSH adjustment, and how large an adjustment it receives, depends on the hospital's "disproportionate patient percentage." See, 42 U.S.C. §1395ww(d)(5)(F)(v). The "disproportionate patient percentage" is the sum of two fractions, the "Medicare and Medicaid fractions," expressed as a percentage for a hospital's cost reporting period. 42 U.S.C. §1395ww(d)(5)(F)(vi). The Medicare fraction's numerator is the number of hospital patient days for patients entitled to both Medicare Part A and Supplemental Security Income, excluding patients receiving State supplementation only, and the denominator is the number of patient days for patients entitled to Medicare Part A. Id. The Medicaid fraction's numerator is the number of

Page 3                                             CN: 00-1904G

hospital patient days for patients who were eligible for medical assistance under a State plan approved under Title XIX for such period but not eligible for benefits under Medicare Part A, and the denominator is the total number of the hospital's patient days for such period. Id.; see also 42 C.F.R. §412.106(b)(4). The Medicaid fraction is frequently referred to as the Medicaid Proxy and is the only fraction at issue in this case.

## STATEMENT OF THE CASE AND PROCEDURAL HISTORY:

St. Mary's of the Plains and Methodist Hospital (the Providers), are acute care hospitals in the State of Texas that received payments under Medicare Part A for services to Medicare beneficiaries during the cost reporting periods ending in 1991, and 1993 through 1997. Both Providers were participants in the Texas State Medicaid program and rendered care to patients eligible for the charity care program established by the state Medicaid program. Neither Provider received Medicaid DSH payments for the services rendered to the charity care patients, but both Providers received DSH reimbursement in addition to their PPS reimbursement for services rendered to Medicare beneficiaries during most of the years at issue.[1]

At issue in this case is whether patient days attributable to the Texas Charity Care Plan should have been recognized in the Medicaid fraction of the DSH calculation for the Providers.

The Providers appealed the DSH reimbursement to the Board on February 25, 2000. The Providers were represented by Teresa A. Sherman, Esq. of Sherman Law Office, PLLC. The Intermediary was represented by Byron Lamprecht, Senior Appeals Consultant, of Mutual of Omaha Insurance Company.

## JURISDICTIONAL CHALLENGE - PARTIES' CONTENTIONS:

Pursuant to 42 U.S.C. § 1395oo(a) and 42 C.F.R. §§ 405.1835 -1841, a provider has a right to a hearing before the Board with respect to costs claimed on a timely filed cost report if it is dissatisfied with the final determination of the intermediary, the amount in controversy is $10,000 or more ($50,000 for a group appeal), and the request for a hearing is filed within 180 days of the date of the final determination.

The Intermediary contends that the Providers have not met the "amount in controversy" prerequisite for a Board hearing. Although the Providers indicated in their jurisdictional documents that the amount in controversy was approximately $485,000, the Intermediary challenges the validity of this amount as simply a guess and that no confirmation or verification can be made without a listing of the patient days in dispute. Therefore, the Intermediary asserts that the Provider's contentions are undocumented and there is no amount in dispute.

---

[1] As the NPRs included with the Schedules of Providers in the record for fiscal years ended 1993 and 1997 for St. Mary of the Plains did not specifically identify that DSH payments were received, it is unclear if the Provider received a DSH payment for those years.

Page 4                                                        CN: 00-1904G

The Providers assert that an estimate of days was submitted in the jurisdictional documents which calculated an estimated reimbursement impact per cost reporting period based upon a projected increase in the total Medicaid days relative to this issue (.30% for each Provider and cost reporting year). The Providers acknowledged at the hearing that although a detailed listing of the days in dispute had been provided to the Intermediary prior to the start of the hearing, the listing was not included in the record and a reconciliation had not been completed between the days in dispute and the dollar amount included in the jurisdictional filing.

## JURISDICTIONAL CHALLENGE – BOARD CONCLUSION

Once a provider meets a certain disproportionate share percentage threshold, the provider is entitled to a DSH add-on payment and any additional days would result in an incremental increase. The DSH calculation is a product of ratios. The Providers in this case used an incremental increase percentage to calculate what they believe would be the impact on their DSH percentage and payment.

The Board finds that the "amount in controversy" is the amount claimed by the Providers. Determining jurisdiction does not require proof that the exact amount claimed is adequately supported. The Providers used a percentage to estimate the amount in controversy. The nature of the DSH calculation is that it is a fraction which is the sum of two other fractions. Therefore, percentages are fundamental to the DSH calculation, and the Board does not find it unreasonable for the Providers to express the "amount in controversy" as a percentage instead of a specific number of days. The Board finds the evidence in the record sufficient to show that the amount in controversy exceeds the $50,000 group appeal jurisdictional threshold.

## PARTIES' CONTENTIONS:

The Providers argue that the language of the Medicare DSH statute is clear and unambiguous. Under the statute, the Medicaid proxy of the DSH calculation includes all of a hospital's "patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under Title XIX of this chapter, but who were not entitled to [Medicare Part A benefits]." 42 U.S.C. §1395ww(d)(5)(F)(vi)(II). Therefore, it is the provisions of the State Plan that determine the eligibility of patients to be counted in the Medicaid proxy.

The Providers contend that the Texas State Medicaid Plan (the plan) was amended September 1, 1993 to provide reimbursement for charity care provided by the hospitals.[2] The Providers included in the record, the portion of the plan that allowed for payment to qualified hospitals for inpatient services provided to indigent or "charity care" patients at Exhibit P-1. The effective date of the plan included in the record is September 1, 1995. Mr. Richard Peters, a previous employee of the Texas Department of Health that administers the Texas Medicaid program, testified that the same basic provisions in the

---

[2] Tr. Page 67.

plan dated September 1, 1995 were in effect as of September 1, 1993 through 1997.[3] The Providers contend that because the Texas charity care program is part of the Texas State Medicaid Plan approved under Title XIX that provides Federal Financial Participation (FFP) for medical services provided to this defined group of low-income patients, the days associated with that program are required to be included in the Medicaid proxy for the Medicare DSH calculation.

The Providers assert that minimum charity care requirements are imposed on Texas hospitals to qualify for participation in the State Medicaid program. Hospitals file an annual survey report with the State to document the level of charity care they provide. Pursuant to the terms of the Title XIX State plan, the State identifies and reimburses those hospitals that provide a disproportionate share of inpatient care to indigent patients. Therefore, not all hospitals that render charity care services qualify to receive payment for those services. The Providers in this case did not provide charity care at a level sufficient to meet the mathematical test in place for the years in issue to qualify for Medicaid DSH payments. The Providers argue that regardless of whether they were paid for the services, they did provide the services to eligible patients and, therefore, the days associated with those services should be included in the Medicaid proxy.

The Intermediary asserts that the terms "medical assistance" in §1886(d)(5)(F)(vi)(II) of the Social Security Act (as codified at 42 U.S.C. §1395ww(d)(5)(F)(vi)(II) and "Medicaid" in 42 C.F.R. §412.106(b)(4) are interchangeable, and both mean that Medicaid eligibility is required in order for a patient's days to be included in the Medicaid proxy.

> 42 U.S.C. §1395ww(d)(5)(F)(vi)(II): the fraction (expressed as a percentage), the numerator of which is the number of the hospital's patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under subchapter XIX of this chapter, but who were not entitled to benefits under part A of this subchapter, and the denominator of which is the total number of the hospital's patient days for such period. (emphasis added)

> 42 C.F.R. § 412.106(b)(4): *Second computation*. The fiscal intermediary determines, for the hospital's cost reporting period, the number of patient days furnished to patients entitled to Medicaid but not to Medicare part A, and divides that number by the total number of patient days in the same period.[4] (emphasis added)

The Intermediary asserts that the term "medical assistance" is not defined in the statute and that nothing in the statutory language indicates congressional intent to prohibit the

---

[3] Tr. Page 94.
[4] 42 C.F.R. §412.106(b)(4) did not change during the FY's covered in this appeal.

Secretary from interpreting the term "medical assistance". The Secretary has interpreted "eligible for medical assistance under a State plan approved under Title XIX" as meaning eligible for Medicaid. The Secretary has reasonably excluded the non-Medicaid days because the statute does not unambiguously require their inclusion. The Secretary's interpretation is reasonable and is entitled to deference.

Additionally, the Intermediary argues that the Providers were unable to substantiate at the hearing that the hospitals actually participated in the charity care program, and if so, how many days of charity care were provided by the hospitals. The Intermediary asserts that neither the Providers' witness testimony nor the record identifies how many charity care days, if any, are in dispute. Therefore, the Providers have failed to show proof that they rendered charity care to indigent patients under an approved plan.

## <u>FINDINGS OF FACT, CONCLUSIONS OF LAW AND DISCUSSION:</u>

After considering the Medicare law and program instructions, the evidence presented and the parties' contentions, the Board finds and concludes as follows:

It is undisputed that 42 U.S.C. §1395ww(d)(5)(F)(vi)(II) governs the issue in this case. Under the Medicare statute, the Medicaid proxy of the DSH calculation includes all "patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under subchapter XIX of this chapter, but who were not entitled to [Medicare Part A benefits]." The Providers submitted excerpts from the Texas State plan effective September 1, 1995[5] which documented that the charity care program at issue was, in fact, included in the Texas State plan and the evidence established that it remained in effect through September 1, 2001.

The Providers' witness testified that the Texas State Medicaid plan was totally revamped as of 1993[6] and that the effective date was September 1, 1993. The Providers did not furnish the State plan in effect prior to September 1, 1995; however, the Providers' witness testified that he was involved with writing the State plan and was familiar with the requirements of the plan, and knew that the charity care program was substantially the same in the September 1, 1995 plan as in the 1993 plan. The Board finds the Providers' witness testimony to be credible that substantially the same plan was in effect starting September 1, 1993 through September 1, 2001. There is no evidence in the record that the charity care program was in effect prior to that date, however. Therefore, the Board finds that the Providers have failed to meet their burden of proof that the charity care program was part of the State Plan for FY 1991.

The purpose of the DSH statute is to compensate hospitals for the additional costs associated with treating low-income patients. The plain language of the statute requires all days relating to patients eligible for medical assistance under a State plan approved under Title XIX to be included in the Medicaid proxy. The Board finds no authority or overriding rationale to limit the term "eligible for medical assistance under a State plan

---

[5] Provider Exhibit P-1. The plan included in the record covered the years in issue of 1996 and 1997.
[6] Tr. pgs 64-66, 95 and 110.

approved under Title XIX" to the Intermediary's Medicaid-eligible definition. Although the patients in the charity care program did not qualify for Medicaid under Section 1901 of the Social Security Act, the patients do qualify for medical assistance under a State approved plan as these programs are included in the State approved plan. See previous Board decisions: Ashtabula County Medical Center et al. v. BlueCross BlueShield Association/AdminiStar Federal, Inc., PRRB Case No. 2005-D49 (August 10, 2005) and Washington State Medicare DSH Group II v. BlueCross BlueShield Association, PRRB Case no. 2007 D-5 (November 22, 2006) and the recent decision from the Unites States District Court for the District of Columbia, Adena Regional Medical Center v. Michael A. Leavitt, United States District Court for the District of Columbia, Civil Action No. 05-2422 (LFO), (June 21, 2007).

Although Providers did not receive payment for the days in question, the paid versus eligible days issue was resolved with cases such as Jewish Hospital, Inc. v. Secretary of Health and Human Services, 19 F.3d 270, 272 (6th Cir. 1994), Deaconess Health Services, Corp. v. Shalala, 83 F.3d 1041 (8th Cir. 1996), and Legacy Emanuel Hospital and Health Center v. Shalala, 97 F.3d 1261, 1266 (9th Cir. 1996) and the CMS issuance of Program Memorandum A-99-62. There is no evidence in the record of why the hospitals did not qualify to receive payment for the charity care services rendered, i.e., whether it was a qualifying threshold issue, or that they did not meet other conditions of participation, although the Providers assert in their Post Hearing Brief that the Providers "did not provide the charity care at a level sufficient to meet the mathematical test in place for those years".[7] The Board, therefore, finds consistent with the above referenced cases, that the Providers' failure to be paid for the services rendered to charity care patients is irrelevant, as the basis for their inclusion in the Medicaid proxy is based on their "eligibility" status.

Although the Providers established that charity care days for the period beginning September 1, 1993 and ending June 30, 1997 should be counted, the Providers failed to meet their burden of proof in an essential element of their case. The Providers presented absolutely no evidence of the charity care days they are claiming; nor was there any evidence in the record of the Providers' attempt to resolve the specific days prior to the hearing. This was the basis of the Intermediary's motion to dismiss the case, or alternatively to exclude any evidence that was not submitted until shortly before the hearing. However, the Board denied that motion and allowed the Providers to submit any evidence in support of their case during the hearing.. The Providers essentially want the Board to bifurcate the case, i.e., to decide the legal issue of whether the program falls within the State plan and then to later allow the Providers to prove up the number of days for which they are requesting payment. The Board historically does not bifurcate cases, and the Providers did not request, and the Board did not grant, a bifurcation of the case. A hearing date is set for a provider to prove all elements of its case, and in this case the Providers did not address the days at issue.[8] Therefore, the Board finds that the Providers have failed to adequately support their claim to include the Texas charity care days in the DSH computation.

---

[7] Providers' Post Hearing Brief, page 5 and Tr. page 89.
[8] 42 C.F.R. §405.1851.

Page 8                                                        CN: 00-1904G

## DECISION AND ORDER:

The Intermediary's adjustments properly excluded Texas charity care days from the Providers' DSH calculations. The Intermediary's adjustments are affirmed.

## BOARD MEMBERS PARTICIPATING:

Suzanne Cochran, Esquire
Elaine Crews Powell, C.P.A.
Anjali Mulchandani-West, C.P.A.
Yvette C. Hayes
Michael D. Richards, C.P.A.

FOR THE BOARD:

Suzanne Cochran, Esquire
Chairperson


DATE:    JAN 1 1 2008

## SCHEDULE OF PROVIDERS IN GROUP

Group Name  **COVENANT HLTH SYS PL, 93-97 DSH/MEDICAID PROXY GROUP**

Representative  **QUALITY REIMBURSEMENT SERVICES**

Case No.  **00-13046**

Issue  General Assistance Days

Page No. ___1___ of ___1___

Date Prepared  January 11, 2006

| | Provider No. | Provider Name County, State | City, | PRD | Intermediary | A Date of Final Return | B Date of Hearing Request | C No. of Audit Days | D Audit Adj. No. | E Appeal Amount | F Original Case No. | G Date of Add/Transfer |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 45-0040 | CHS - St. Mary of the Plains Hosp. Lubbock, TX | | 6/30/1993 | Trailblazer Health | 9/30/1993 | 9/21/1994 | 175 | 4 | 43,883 | 02-2133 | 2/23/2000 |
| 2 | 45-0040 | CHS - St. Mary of the Plains Hosp. Lubbock, TX | | 6/30/1993 | Mutual of Omaha Ins. | 9/30/1994 | 3/25/1995 | 176 | | 39,263 | 95-1983 | 2/23/2000 |
| 3 | 45-0040 | CHS - St. Mary of the Plains Hosp. Lubbock, TX | | 6/30/1992 | Mutual of Omaha Ins. | 9/30/1996 | 3/25/1997 | 177 | 78 | 56,211 | 97-3214 | 2/23/2000 |
| 4 | 45-0040 | CHS - St. Mary of the Plains Hosp. Lubbock, TX | | 6/30/1995 | Mutual of Omaha Ins. | 9/20/1997 | 3/23/1990 | 175 | P-8 | 59,462 | 98-2012 | 2/23/2000 |
| 5 | 45-0040 | CHS - St. Mary of the Plains Hosp. Lubbock, TX | | 6/30/1996 | Mutual of Omaha Ins. | 3/29/1998 | 11/24/1998 | 179 | 23 | 56,322 | 99-0938 | 2/23/2000 |
| 6 | 45-0040 | CHS - St. Mary of the Plains Hosp. Lubbock, TX | | 6/30/1997 | Mutual of Omaha Ins. | 2/26/1999 | 9/20/1999 | 175 | | 73,513 | 00-2460 | 2/23/2009 |
| 7 | 45-0057 | CHS - Methodist Hospital Lubbock, TX | | 5/31/1997 | Mutual of Omaha Ins. | 9/11/1999 | 12/17/1999 | 128 | 43 | 132,485 | 00-2792 | 2/23/2000 |

TOTAL  484,213

Save copy of document

**EXHIBIT C**

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop C3-07-20
Baltimore, Maryland 21244-1850
Telephone 410-786-3176 Facsimile 410-786-0043



## Office of the Attorney Advisor

MAR 1 1 2008

**CERTIFIED MAIL**

RECEIVED

MAR 1 4 2008

SHERMAN LAW OFFICE, PLLC

Ms. Teresa A. Sherman
Sherman Law Office PLLC
1212 N Washington, Suite 210
Spokane, WA 99201

Re: Covenant Health System 91, 93-97 DSH/Medicaid Proxy Group.
     PRRB Decision No. 2008-D13

Dear Ms. Sherman:

Enclosed is a copy of the Administrator's decision in the above case affirming the decision of the Provider Reimbursement Review Board. This constitutes the final administrative decision of the Secretary of the Health and Human Services. Pursuant to Section 1878(f) of the Social Security Act and 42 CFR 405.1877, the Provider may obtain judicial review by filing a civil action within 60 days of receipt of this decision.

Sincerely yours,

Jacqueline R. Vaughn
Attorney Advisor

Enclosure

cc: Mr. Terry Gouger, Intermediary's Representative

# CENTERS FOR MEDICARE AND MEDICAID SERVICES

## Decision of the Administrator

| | |
|---|---|
| **In the case of:** | **Claim for:** |
| Covenant Health System 91, 93-97 DSH/Medicaid Proxy Group | Provider Cost Reimbursement Determination for Cost Years |
| Provider | Ending: June 30, 1991; June 30, 1993 - June 30, 1997 |
| vs. | |
| Mutual of Omaha Insurance Company | **Review of:** PRRB Dec. No. 2008-D13 |
| Intermediary | Dated: January 11, 2008 |

This case is before the Administrator, Centers for Medicare & Medicaid Services (CMS), for review of the decision of the Provider Reimbursement Review Board (Board). The review is during the 60-day period in § 1878(f)(1) of the Social Security Act (Act), as amended (42 USC 1395oo(f)). The Intermediary submitted comments requesting review of the Board's decision. Comments were also received by the Provider requesting that the Administrator reverse, or remand in part, the Board's decision. The parties were notified of the Administrator's intention to review the Board's decision. The Providers subsequently submitted additional comments. Accordingly, this case is now before the Administrator for final agency review.

## ISSUE AND BOARD'S DECISION

The issue before the Board was whether the Intermediary's calculation of the disproportionate share hospital (DSH) payment was proper.

The Board held that the Intermediary's exclusion of the Texas charity care days from the Providers' DSH calculations was proper, due to the failure of the Providers to submit adequate documentation. The Board observed that §1886(d)(5)(F)(vi)(II) of the Act governs the issue in this case. The Board relied on the Medicare statute, which states that the Medicaid proxy of the DSH calculation includes all "patient

days for such period which consists of patients who (for such days) were eligible for medical assistance under a State plan approved under subchapter XIX of this chapter, but who were not entitled to [Medicare Part A benefits]."

The Board reasoned that the purpose of the DSH statute is to compensate hospitals for the additional costs associated with treating low-income patients. The plain language of the statute requires all days relating to patients eligible for medical assistance under a State plan approved under Title XIX to be included in the Medicaid proxy. The Board found no authority, or overriding rationale, to limit the term "eligible for medical assistance under a State plan approved under Title XIX" to the Intermediary's Medicaid-eligible definition. The Board noted that, although the patients in the charity care program did not qualify for Medicaid under §1901 of the Act, the patients did qualify for medical assistance under a State approved plan as these programs are included in the State approved plan.[1]

Despite the fact that the Providers did not receive payment for the days in question, the paid versus eligible days issue was resolved in prior cases[2] and the CMS issuance of Program Memorandum A-99-62. The Board found there was no evidence in the record of why the hospitals did not qualify to receive payment for the charity care services rendered. The Board, therefore, found consistent with the above referenced cases, that the Providers' failure to be paid for the services rendered to charity care patients was irrelevant, as the basis for their inclusion in the Medicaid proxy was based on their "eligibility" status.

The Board reasoned that, although the Providers established that charity care days for the period beginning September 1, 1993 and ending June 30, 1997 should be counted, the Providers failed to meet their burden of proof as an essential element of their case. The Board found that the Providers presented no evidence of the number of charity care days they were claiming, nor was there any evidence in the record of the Providers' attempt to resolve the specific days prior to the hearing. Therefore, the

---

[1] See Ashtabula County Medical Center et al., PRRB Case No. 2005-D49 (August 10, 2005), and Washington State Medicare DSH Group II, PRRB Case No. 2007-D5 (November 22, 2006) and the recent decision from the United States District Court for the District of Columbia, Adena Regional Medical Center v. Michael A. Leavitt, United States District Court for the District of Columbia, Civil Action No. 05-2422 I.FO). (June 21, 2007).

[2] See Jewish Hospital, Inc. v. Secretary of Health and Human Services, 19 F.3d 270, 272 (6th Cir. 1994); Deaconess Health Services, Corp. v. Shalala, 83 F.3d 1041 (8th Cir. 1996); Legacy Emanuel Hospital and Health Center v. Shalala, 97 F.3d 1261, 1266 (9th Cir. 1996).

Board found that the Providers failed to adequately support their claim to include the Texas charity care days in the DSH computation.

## SUMMARY OF COMMENTS

The Providers commented, noting that the Board was correct in concluding that the charity care days at issue were included in the Texas Title XIX State plan for certain of the periods at issue and, therefore, should be counted for purposes of calculating the Providers' DSH payment. However, the Providers requested that the Administrator review and reverse the Board's finding that the Providers presented absolutely no evidence of the charity care days they are claiming and that there was no evidence in the record of the Providers' attempt to resolve the specific days prior to the hearing.

The Providers argued that the record shows that the Intermediary did receive documentation of the days claimed. While the Providers acknowledged that such documentation was received by the Intermediary only shortly before the hearing, they argued that the Intermediary had an opportunity post-hearing to review the information and reopen the record for additional documentation, cross-examination of the Providers' witness, or other evidence as necessary in response. The Providers noted that the issue presented to the Board was to resolve the "type" of days to be included for purposes of calculating the Providers' DSH payments. They did not request that the Board audit or count the number of days. They pointed out that it was appropriate to provide the information to the Intermediary to review, but that there was no need to provide the same information to the Board prior to the decision on the type of days to be included in the DSH payment calculations.

The Providers also argued that it was unnecessary and would have been inappropriate to provide documentation of actual patient days for the record, as such information would include confidential, protected health information. The Providers contended that the Board did not need this information in order to resolve the issue of the "type" of days that must be included in the calculation of the Providers' DSH payments. The Providers noted that they did not request, or expect, the Board to review detailed and voluminous reports containing the protected health information of the Providers in each of the fiscal years. The Providers expected that, upon the rendering of a decision by the Board regarding the type of days to be included, the Intermediary would cooperate in reviewing and auditing the documentation for the days claimed. The Providers noted that the Board instructions state that the Board is not the body for an initial detailed review of documentation and that such documentation should be timely submitted to the Intermediary. The Board instructions also strongly caution the parties not to submit documents containing patient names, health insurance or Social Security numbers, or other information that identifies individuals, since the record and Board proceedings may be disclosed to the public. Thus, the Providers argued it would have been inappropriate

and unduly burdensome upon the Board to have to review patient data to document the precise number of charity care days claimed by the Providers. Instead, the Board merely needed to determine the type of days to be included and, once the type of days to be included was resolved, the actual calculation of days and reimbursement impact could be resolved by the Intermediary and Providers.

The Providers submitted additional comments and argued that the Administrator affirm the Board's holding that the charity days should be counted for purposes of calculating the Providers' DSH payments. The Providers argued that the clear and unambiguous language of §1886(d)(F)(vi)(II) of the Act looks to the State plan approved under Title XIX for determining the low-income population count. The Providers noted that, in order for a State to participate in the Medicaid program to provide health care to indigent persons and qualify for Federal Financial participation, a State must submit a plan for medical assistance to CMS for approval. The Provider claimed that, although there are specific requirements, such as income and resource limitations, which must be complied with, the States still have broad discretion to specify the categories of individuals who will receive medical assistance under the Plan. The Providers further argued that, once the State plan is approved by CMS, the State is eligible to receive matching payments from the Federal government on behalf of the <u>individuals</u> receiving medical assistance under the State plan.

The Providers contended that the State of Texas implemented its Medicaid DSH Reimbursement Program as part of its Title XIX State plan as required by Federal law. The State recognized that it was necessary to design a way to measure low-income, indigent care that was not covered by traditional Medicaid and Medicare programs. The Providers requested that the Administrator affirm the Board's holding that the charity days should be counted for purposes of calculating the Providers' DSH payments, and cited a number of Board and Court decisions supporting their argument.

The Intermediary submitted comments and contended that the Board incorrectly assumed jurisdiction in this case. The Intermediary challenged the validity of the amount in controversy as simply a guess resulting from an unproven formula and that verification cannot be made without a listing of the patient days in dispute. The Intermediary argued that the Board erred in accepting the Providers' estimate when it found that the Providers failed to present any evidence of the charity care days they were claiming. The Intermediary reasoned that the regulations at 42 C.F.R. §405.1835 and §405.1837 do not allow for estimates. The Intermediary argued that the Providers' contentions are undocumented and, therefore, there is no amount in dispute. The Intermediary further argued that the Board mistakenly determined that the charity care days were allowable in the Medicaid proxy, as it was uncontested that the charity care days at issue in this case were attributable to patients who were not eligible for Medicaid.

5

## DISCUSSION

The entire record, which was furnished by the Board, has been examined, including all correspondence, position papers, and exhibits. The Administrator has reviewed the Board's decision. All comments received timely are included in the record and have been considered.

Relevant to the issue involved in this case, two Federal programs, Medicaid and Medicare involve the provision of health care services to certain distinct patient populations. The Medicaid program is a cooperative Federal-State program that provides health care to indigent persons who are aged, blind or disabled or members of families with dependent children.[3]  The program is jointly financed by the Federal and State governments and administered by the States according to Federal guidelines. Medicaid, under Title XIX of the Social Security Act, establishes two eligibility groups for medical assistance: categorically needy and medically needy. Participating States are required to provide Medicaid coverage to the categorically needy.[4]  The "categorically needy" are persons eligible for cash assistance under two Federal programs: Aid to Families with Dependent Children (AFDC) [42 USC 601 et seq.] and Supplemental Security Income or SSI [42 USC 1381, et seq.]  Participating States may elect to provide for payments of medical services to those aged blind or disabled individuals known as "medically needy" whose incomes or resources, while exceeding the financial eligibility requirements for the categorically needy (such as an SSI recipient), are insufficient to pay for necessary medical care.[5]

In order to participate in the Medicaid program, a State must submit a plan for medical assistance to CMS for approval. The State plan must specify, inter alia, the categories of individuals who will receive medical assistance under the plan and the specific kinds of medical care and services that will be covered.[6]  If the State plan is approved by CMS, under §1903 of the Act, the State is thereafter eligible to receive matching payments from the Federal government based on a specified percentage (the Federal medical assistance percentage) of the amounts expended as medical assistance under the State plan.

Within broad Federal rules, States enjoy a measure of flexibility to determine eligible groups, types and range of services, payment levels for services, and administrative and operating procedures.[7]  However, the Medicaid statute sets forth a number of requirements, including income and resource limitations that apply to individuals who

---

[3]  Section 1901 of the Social Security Act (Pub. Law No. 89-97).
[4]  Section 1902(a)(10) of the Act.
[5]  Section 1902(a)(1)(C)(i) of the Act.
[6]  Id. §1902, et seq.. of the Act.
[7]  Id.

wish to receive medical assistance under the State plan. Individuals who do not meet the applicable requirements are not eligible for "medical assistance" under the State plan.

In particular, §1901 of the Social Security Act sets forth that appropriations under that title are "[f]or the purpose of enabling each State, as far as practicable under the conditions in such State, to furnish medical assistance on behalf of families with dependent children and of aged, blind or disabled individuals whose incomes and resources are insufficient to meet the costs of necessary medical services...." Section 1902 sets forth the criteria for State plan approval.[8] As part of a State plan, § 1902(a) (13) (A) (iv) requires that a State plan provide for a public process for determination of payment under the plan for, inter alia, hospital services which in the case of hospitals, take into account (in a manner consistent with section 1923) the situation of hospitals which serve a disproportionate number of low-income patients with special needs. Notably, § 1905(a) states that for purposes of this title, "the term 'medical assistance' means the payment of part or all of the costs" of the certain specified "care and medical services" and the identification of the individuals for whom such payment may be made.

Section 1923 of the Act implements the requirements that a State plan under Title XIX provide for an adjustment in payment for inpatient hospital services furnished by a disproportionate share hospital. A hospital may be deemed to be a Medicaid disproportionate share hospital pursuant to §1923(b) (1) (A), which addresses a hospital's Medicaid inpatient utilization rate, or under paragraph (B), which addresses a hospital's low-income utilization rate. The latter criterion relies, inter alia, on the total amount of the hospital's charges for inpatient services, which are attributable to charity care.[9]

Congress recognized that the various conditions and requirements of Title XIX of the Act, under which a State may participate in the Medicaid program, created certain obstacles to potentially innovative and productive State health-care initiatives.

---

[8] 42 C.F.R. 200.203 defines a State plan as "a comprehensive written commitment by a Medicaid agency submitted under section 1902(a) of the Act to administer or supervise the administration of a Medicaid plan in accordance with Federal requirement."

[9] Congress has revisited the Medicaid DSH provision several times since its establishment. In 1993, Congress enacted further limits on DSH payments pursuant to section 13621 of Pub. Law 103-66 that took into consideration costs incurred for furnishing hospital services by the hospital to individuals who are either eligible for Medicare assistance under the State plan or have no health insurance (or other source of third party coverage for services provided during the year). The Medicaid DSH payments may not exceed the hospital's Medicaid shortfall; that is; the amount by which the costs of treating Medicaid patients exceeds hospital Medicaid payments plus the cost of treating the uninsured.

Consequently, Title XI of the Act was amended to allow States to pursue such innovative programs.[10] Under §1115 of subchapter XI of the Act, a State that wishes to conduct such an innovative program must submit an application to CMS for approval. CMS may approve the application, if, in their judgment, the demonstration project is likely to assist in promoting the objectives of certain programs established under the Act, including Medicaid.[11] To facilitate the operation of an approved demonstration project, CMS may waive compliance with specified requirements of Title XIX, to the extent necessary and for the period necessary to enable the State to carry out the demonstration project.[12] In addition, CMS may direct that costs of the demonstration project that would not "otherwise" qualify as section 1903 Medicaid expenditures, "be regarded as expenditures under the State plan approved under [Title XIX]."[13]

While Title XIX implemented medical assistance pursuant to a cooperative program with the States for certain low-income individuals, the Social Security Amendments of 1965[14] established Title XVIII of the Act, which authorized the establishment of the Medicare program to pay part of the costs of the health care services furnished to entitled beneficiaries. The Medicare program primarily provides medical services to aged and disabled persons and consists of two Parts: Part A, which provides reimbursement for inpatient hospital and related post-hospital, home health, and hospice care,[15] and Part B, which is a supplemental voluntary insurance program for hospital outpatient services, physician services and other services not covered under Part A.[16] At its inception in 1965, Medicare paid for the reasonable cost of furnishing covered services to beneficiaries.[17] However, concerned with increasing costs, Congress enacted Title VI of the Social Security Amendments of 1983.[18] This provision added §1886(d) of the Act and established the inpatient prospective payment system (IPPS) for reimbursement of inpatient hospital operating costs for all items and services provided to Medicare beneficiaries, other than physician's services, associated with each discharge. The purpose of IPPS was to reform the financial incentives hospitals face, promoting efficiency by rewarding cost effective hospital practices.[19]

---

[10] Section 1115 of the Act.

[11] Id.

[12] Id.

[13] Id.

[14] Pub. Law No. 89-97.

[15] Section 1811-1821 of the Act.

[16] Section 1831-1848(j) of the Act.

[17] Under Medicare, Part A services are furnished by providers of services.

[18] Pub. Law No. 98-21.

[19] H.R. Rep. No. 25, 98th Cong., 1st Sess. 132 (1983).

8

These amendments changed the method of payment for inpatient hospital services for most hospitals under Medicare. Under IPPS, hospitals and other health care providers are reimbursed their inpatient operating costs on the basis of prospectively determined national and regional rates for each discharge rather than reasonable operating costs. Thus, hospitals are paid based on a predetermined amount depending on the patient's diagnosis at the time of discharge. Hospitals are paid a fixed amount for each patient based on one of more than 700 diagnosis related groups (DRG) subject to certain payment adjustments.

Concerned with possible payment inequities for IPPS hospitals that treat a disproportionate share of low-income patients, pursuant to §1886(d) (5) (F) (i) of the Act, Congress directed the Secretary to provide, for discharges occurring after May 1, 1986, "for hospitals serving a significantly disproportionate number of low-income patients...."[20] There are two methods to determine eligibility for a Medicare DSH adjustment: the "proxy method" and the "Pickle method."[21] To be eligible for the DSH payment under the proxy method, an IPPS hospital must meet certain criteria concerning, inter alia, its disproportionate patient percentage. Relevant to this case, with respect to the proxy method, §1886 (d)(5)(F)(vi) of the Act states that the term "disproportionate patient percentage" means the sum of two fractions which is expressed as a percentage for a hospital's cost reporting period. The fractions are often referred to as the "Medicare low-income proxy" and the "Medicaid low-income proxy", respectively, and are defined as follows:

> (I) the fraction (expressed as a percentage) the numerator of which is the number of such hospital's patient days for such period which were made up of patients who (for such days) were entitled to benefits under Part A of this title and were entitled to supplemental security income benefits (excluding any State supplementation) under title XVI of this Act and the denominator of which is the number of such hospital's patients day for such fiscal year which were made up of patients who (for such days) were entitled to benefits under Part A of this title.

> (II) the fraction (expressed as a percentage), the numerator of which is the number of the hospital's patient days for such period which consists of patients who (for such days) were eligible for medical assistance under a State Plan approved under title XIX, but who were not entitled to benefits under Part A of this title, and the denominator of which is the total number of the hospital patient days for such period. (Emphasis added.)

---

[20] Section 9105 of the Consolidated Omnibus Budget Reconciliation Act of 1985 (Pub. Law No. 99-272). See also 51 Fed. Reg. 16772, 16773-16776 (1986).

[21] The Pickle method is set forth at section 1886(d) (F) (i) (II) of the Act.

CMS implemented the statutory provisions at 42 C.F.R. § 412.106. The first computation, the "Medicare proxy" or "Clause I" is set forth at 42 C.F.R. § 412.106(b) (2). Relevant to this case, the second computation, the "Medicaid-low income proxy", or "Clause II", is set forth at 42 C.F.R. § 412.106(b) (4) (1995) and provides that:

> *Second computation.* The fiscal intermediary determines, for the hospital's cost reporting period, the number of patient days furnished to <u>patients entitled to Medicaid</u> but not to Medicare Part A, and divides that number by the total number of patient days in the same period. (Emphasis added.)

Although not at issue in this case, CMS revised 42 C.F.R. § 412.106(b)(4) to conform to HCFA Ruling 97-2, which was issued in light of Federal Circuit Court decisions disagreeing with CMS' interpretation of a certain portion of § 1886(d)(5)(vi)(II) of the Act. In conjunction with this revision, CMS issued a Memorandum dated June 12, 1997, which explained the counting of patient days under the Medicaid fraction, stating that:

> [I]n calculating the number of Medicaid days, fiscal intermediaries should ask themselves, "Was this person a Medicaid (Title XIX) beneficiary on that day of service?" If the answer is "yes," the day counts in the Medicare disproportionate share adjustment calculation. This does not mean that title XIX had to be responsible for payment for any particular services. It means that the person had to have been determined by a State agency to be eligible for Federally-funded medical assistance for any one of the services covered under the State Medicaid Title XIX plan (even if no Medicaid payment is made for inpatient hospital services or any other covered service)....

In order to clarify the definition of eligible Medicaid days and to communicate a hold harmless position for cost reporting periods beginning before January 1, 2000, for certain providers, CMS issued Program Memorandum (PM) A-99-62, dated December 1999. The PM responded to problems that occurred as a result of hospitals and intermediaries relying on Medicaid State days data obtained from State Medicaid agencies to compute the DSH payment that commingled the types of otherwise ineligible days listed with the Medicaid days.

In clarifying the type of days that were proper to include in the Medicaid proxy, the PM A-99-62 stated that the hospital must determine whether the patient was eligible

for Medicaid under a State plan approved under Title XIX on the day of service. The PM explained that:

> In calculating the number of Medicaid days, the hospital must determine whether the patient was eligible for Medicaid under a State plan approved under Title XIX on the day of service. If the patient was so eligible, the day counts in the Medicare disproportionate share adjustment calculation. The statutory formula for Medicaid days reflects several key concepts. First, the focus is on the patient's eligibility for Medicaid benefits as determined by the State, not the hospital's eligibility for some form of Medicaid payment. Second, the focus is on the patient's eligibility for medical assistance under an approved Title XIX state plan, not the patient's eligibility for general assistance under a State-only program; Third, the focus is on eligibility for medical assistance under an approved Title XIX State plan, not medical assistance under a State-only program or other program. Thus, for a day to be counted, the patient must be eligible on that day for medical assistance benefits under the Federal-State cooperative program known as Medicaid (under an approved Title XIX State plan).

Consistent with this explanation of days to be included in the Medicare DSH calculation, the PM stated regarding the exclusion of days, that:

> Many States operate programs that include both State-only and Federal-State eligibility groups in an integrated program.... These beneficiaries, however, are not eligible for Medicaid under a State plan approved under Title XIX, and therefore, days utilized by these beneficiaries do not count in the Medicare disproportionate share adjustment calculation. If a hospital is unable to distinguish between Medicaid beneficiaries and other medical assistance beneficiaries, then it must contact the State for assistance in doing so.

> In addition, if a given patient day affects the level of *Medicaid* DSH payments to the hospital, but the patient is not eligible for Medicaid under a State plan approved under title XIX on that day, the day is not included in the *Medicare* DSH calculation.

> \*\*\*\*

Regardless of the type of allowable Medicaid day, the hospital bears the burden of proof and must verify with the State that the patient was eligible under one of the allowable categories during each day of the

patient's stay. The hospital is responsible for and must provide adequate documentation to substantiate the number of Medicaid days claimed.[22] (Emphasis added.)

In the August 1, 2000 <u>Federal Register</u>, the Secretary reasserted his policy regarding general assistance days, State-only health program days, and charity care days,

> General assistance days are days for patients covered under a State-only or county-only general assistance program, whether or not any payment is available for health care services under the program, Charity care days are those days that are utilized by patients who cannot afford to pay and whose care is not covered or paid by any health insurance program. While we recognize that these days may be included in the calculation of a State's Medicaid DSH payments, these patients are not Medicaid eligible under the State plan and are not considered Titled XIX beneficiaries.[23]

In addition, for the relevant fiscal periods in dispute, the Secretary's policy was to include in the Medicare DSH calculation, only those days for populations under the Title XI § 1115 waiver who were or could have been made eligible under a State plan. The patient days of the "expanded" eligibility groups, however, were not to be included in the Medicare DSH calculation.[24]    This policy did not affect the

---

[22]    An attachment to the PM describes the type of day, description of the day and whether the day is a Title XIX day for purposes of the Medicare DSH calculation. In particular, the attachment describes "general assistance patient days" as "days for patients covered under a State-only (or county only) general assistance program (whether or not any payment is viable for health care services under the program). These patients are not Medicaid–eligible under the State plan." The general assistance patient day is not considered an "eligible Title XIX day," "Other State-only health program patient days" are described as "days for patients covered under a State-only health program. These patients are not Medicaid-eligible under the State program." Likewise. State-only health program days are not eligible Title XIX days. Finally, charity care patient days are described as "days for patients not eligible for Medicaid or any other third-party payer and claimed as uncompensated care by a hospital. These patients are not Medicaid eligible under the State plan." Charity care patient days are not eligible Title XIX days.

[23] 65 Fed. Reg. 47054 at 47087 (Aug. 1, 2000).

[24] 65 Fed. Reg. 3136 (Jan. 20, 2000). ("In some section 1115 waivers, a given population that otherwise could have been made eligible for Medicaid under section 1902(r)(2) or 1931(b) in a State plan amendment was made eligible under the section 1115 waiver. This population was referred to as hypothetical eligible, and is a

12

longstanding policy of not counting general assistance charity care or State–only days in the Medicare DSH calculation. The policy of excluding §1115 waiver expansion populations from the DSH calculation was revisited by CMS and, effective with discharges occurring on, or after, January 20, 2000, certain §1115 waiver expansion days were to be included in the Medicare DSH calculation in accordance with the specific instructions as specified in more detail in the January 20, 2000 <u>Federal Register</u>.[25]

In 2001, CMS issued a Program Memorandum (PM) Transmittal A-01-13,[26] which again stated, regarding two specific types of Medicaid DSH days, that:

> *Days for patients who are not eligible for Medicaid benefits, but are considered in the calculation of Medicaid DSH payments by the State.* These patients are not Medicaid eligible. Sometimes Medicaid State plans specify that Medicaid DSH payments are based upon a hospital's amount of charity care of general assistance days. This, however, is not "payment" for those days and does not mean that the patient is eligible for Medicaid benefits or can be counted as such in the Medicaid formula.

> \*\*\*\*

> *Days for patients covered under a State-only (or count-only) general assistance program (whether or not any payment is available for health care services under the program).* These patients are not Medicaid-eligible under the State plan. (Emphasis added.)

---

specific, finite population identifiable in the budget neutrality agreements found in the Special Terms and Conditions for the demonstrations. The patient days utilized by that population are to be recognized for purposes of calculating the Medicare DSH adjustment. In addition, the section 1115 waiver may provide for medical assistance to expanded eligibility populations that could not otherwise be made eligible for Medicaid. Under current policy, hospitals were to include in the Medicare DSH calculation only those days for populations under the §1115 waiver who were or could have been made eligible under a state plan. Patient days of the expected eligibility groups however, were not to be included in the Medicare DSH calculation.")

[25] <u>Id</u>.

[26] The PM, while restating certain longstanding interpretations in the background material, clarified certain other points for cost reporting periods beginning on or after January 1, 2000, with respect to the hold harmless policy. <u>See</u> Transmittal A-01-13; Change Request 1052 (January 25, 2001)

In sum, for the cost years at issue, the Secretary has consistently required the exclusion of days relating to general assistance, charity care, or State-only days. The policy distinguishes days for individuals that receive medical assistance under a Title XIX State plan that are to be counted and "other" days that are not to be counted. Examples of some of these other days include days for individuals that are not in fact eligible for medical assistance but may receive State assistance; charity care days that may be a basis for Medicaid DSH payment under the State plan only; or days related to individuals that may receive benefits under a Title XI plan. These "other" days are not counted for purposes of the Medicare DSH payment.

In this case, the Providers alleged that the Intermediary improperly did not include the charity care days in the DSH calculation. The plan allowed for a Medicaid DSH payment to qualified hospitals for inpatient services provided to indigent or "charity care" patients.[27] The Providers asserted that the Texas Medicaid DSH program was thus part of the Texas State Medicaid Plan approved under Title XIX that provides Federal Financial Participation (FFP) for medical services provided to this defined group of low-income patients. The Providers claimed that the total numbers of days associated with the Medicaid DSH program were required to be included in the resulting DSH calculation. The Board held that charity care days should be included in the Medicaid fraction.[28] However, because the Providers failed to produce adequate documentation to support its claim to include the Texas charity care days in the DSH computation, the Intermediary's adjustment was proper.

The Administrator finds that §1886(d)(5)(F)(vi)(II) of the Act requires, for purposes of determining a provider's "disproportionate patient percentage," that the Secretary count patient days attributable to patients who were eligible for medical assistance

---

[27] See, State of Texas Disproportionate Share Hospital Reimbursement Program for Hospitals Other than State-Owned Teaching Hospitals, Provider's Position Paper, Exhibit P-1, pg. 3.

[28] The Provider submitted excerpts from the Texas State plan effective September 1, 1995 in Provider Exhibit P-1, which documented that the Medicaid DSH program was included in the Texas State plan and the evidence established that it remained in effect through September 1, 2001. The Provider's witness testified that the Texas State Medicaid plan was totally revamped as of 1993 and that the effective date was September 1, 1993. (Transcript pgs. 64-66, and 110). The Board found that the Providers' witness testimony to be credible that substantially the same plan was in effect starting September 1, 1993 through September 1, 2001. However, there was no evidence in the record that a Medicaid DSH program was in effect prior to that date, that used the same methodology.

14

under a State plan approved under Title XIX of the Act, but who were not also entitled to Medicare Part A. The Administrator finds that, as reflected at 42 C.F.R. § 412.106, the Secretary has interpreted this statutory phrase "patients who (for such days) were eligible for medical assistance under a State plan approved under Title XIX," to mean "eligible for Medicaid."[29] The Administrator further finds that the term "Medicaid" refers to the joint Federal-State program of medical assistance authorized under Title XIX of the Act. If a patient is not eligible for Medicaid, then the patient is not "eligible for medical assistance under a State plan approved under Title XIX."

The Administrator finds that the language set forth in §1886(d) (5) (F) (vi) (II) of the Act requires that the day be related to an individual eligible for "medical assistance under a State plan approved under Title XIX" also known as the Federal Program Medicaid. The use of the term "medical assistance" at §§1901 and 1905 of the Act and the use of the term "medical assistance" at §1886(d) (5) (F) (vi) (II) of the Act is reasonably concluded to have the same meaning. As noted by the courts, "the interrelationship and close proximity of these provisions of the statute presents a classic case for the application of the normal rule of statutory construction that 'identical words used in different parts of the same act are intended to have the same meaning.' "[30] Therefore, the Administrator finds that the language at §1886(d) (5) (F) (vi) (II) of the Act requires that for a day to be counted, the <u>individual</u> must be eligible for "medical assistance" under Title XIX.[31] That is, the <u>individual</u> must be eligible for the Federal government program also referred to as Medicaid.

---

[29] See e.g. <u>Cabell Huntington Hosp. Inc. v. Shalala</u>, 101 F.3d 984, 989 (4th Cir. 1996) ("It is apparent that 'eligible for medical assistance under a State plan' refers to patients who meet the income, resource, and status qualifications specified by a particular state's Medicaid plan...."); <u>Legacy Emanuel Hospital v. Secretary</u>, 97 F.3d 1261, 1265 (9th Cir. 1996)("[T]he Medicaid proxy includes all patient days for which a person was eligible for Medicaid benefits whether or not Medicaid actually paid for those days of service.")

[30] <u>Sullivan v. Stroop</u>. 496 U.S. 478, 484 (1990); <u>Commissioner v. Lundy</u>, 516 U.S. 235, 250 (1996).

[31] Congress added language to §1886(d) (5) (F) (vi) (II) of the Act which stated: "In determining under subclause (II) the number of the hospital's patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under title XIX, the Secretary may, to the extent and for the period the Secretary determines appropriate, include patient days of patients not so eligible but who are regarded as such because they receive benefits under a demonstration project approved under title XI." Deficit Reduction Act of 2005 (DRA), Pub. L. No. 109-171, § 5002, 120 Stat. 4, 31 (February 8, 2006) (codified in part at 42 U.S.C. § 1395ww (d) (5) (F) (vi) (II). This amendment to

In contrast, the days involved in this case are related to individuals that are not eligible for "medical assistance" as that term is used under Title XIX and, thus, are not properly included in the Medicaid patient percentage of the Medicare DSH calculation under §1886(d)(5)(F)(vi)(II) of the Act.   The Administrator finds that the days in question are used to provide a Medicaid DSH payment and the days are related to individuals that are not eligible for medical assistance under a State plan approved under Title XIX.  For example, the "State of Texas Disproportionate Share Hospital Reimbursement Program" describes the Medicaid DSH calculation that is based, in part, on inpatient charity charges, and states that:

> Total inpatient charity charges, excluding bad debt charges, means the total amount of the hospital's charges for inpatient hospital services attributed to charity care (care provided to individuals who have no source of payment, third-party or personal resources) in a cost reporting period.[12]

As stated above, the Secretary has interpreted the term "eligible for medical assistance under a State Plan approved under Title XIX" to mean that the individual is eligible for the Federal government program also referred to as Medicaid.  Section 1886(d)(5)(F)(vi) (II) of the Act requires that for a day to be counted, the individual must be eligible for "medical assistance" under Title XIX.  Therefore, the Administrator finds that the charity care days are specifically related to the charity charges and not to the individual's eligibility for "medical assistance" as described in Title XIX.

In addition, eligibility for "medical assistance" under Title XIX, e.g., Medicaid, is determined by the State based on Federal rules, not the hospital.  In this case, it is the hospital that is eligible for the Medicaid DSH program, not a specific individual patient.

---

§1886(d)(5)(F)(vi) of the Act specifically addressed the scope of the Secretary's authority to include (or exclude), in determining the numerator of the Medicaid fraction of the Medicare DSH calculation, patient days of patients not eligible for medical assistance under a State plan but who receive benefits under a demonstration project approved under Title XI of the Act. This enactment clearly distinguishes those patients eligible to receive benefits under Medicaid from those patients not so eligible but who are regarded as such because they receive benefits under a demonstration project approved under title XI. This amendment left untouched CMS longstanding policy on general assistance days.

[12] See. State of Texas Disproportionate Share Hospital Reimbursement Program for Hospitals Other Than State-Owned Teaching Hospitals, Provider Position Paper, Exhibit P-1.

as reflected in the application process.[33]   The application to be filed by the hospital specifically states:

> In order to receive Medicaid disproportionate share funds in State Fiscal Year 1999, a hospital's fiscal year 1997 total charity care charges must be equal to or greater than 25 percent of its net State Fiscal Year 1998 disproportionate share payments.[34]

In calculating the charity care charges, the application explains that the hospital is to use the following definition:

> Total Hospital Charges for services provided to patients who have no health insurance or other source of Third Party Payment, less the amount of payments made by or on behalf of these patients.... <u>Charges for services delivered to patient eligible for Medicaid or Medicare must be excluded from the report.</u>[35] (Emphasis added.)

Thus, applying the relevant law and program policy to the foregoing facts, the Administrator finds that the Intermediary properly did not include the charity care days in the numerator of the Medicaid fraction. The Administrator agrees with that part of the Board's conclusion that the Provider failed to properly support their claim to include the Texas charity care days in the DSH calculation.[36] However, this conclusion is secondary to the finding that such charity care days should not be included in the calculation based on the foregoing legal analysis.

---

[33] <u>See</u>, Provider Position Paper, Exhibit P-2.

[34] <u>See</u>, Provider Position Paper, Exhibit P-2, p. 1.

[35] <u>See</u>, Provider Position Paper, Exhibit P-2, p. 3.  Apparently, in this case the Providers acknowledged that they did not meet the necessary threshold under the State plan to receive Medicaid DSH payments.  Therefore, the Hospital was not "eligible" for a Medicaid DSH payment, making the Board's analogy to paid versus claimed days further flawed.

[36] The regulation at 42 C.F.R. §412.106(b) states that "the hospital has the burden of furnishing data adequate to prove eligibility for each Medicaid patient day claimed under this paragraph, and of verifying with the State that a patient was eligible for Medicaid during each claimed patient hospital day..." The regulations establish specific guidelines for the maintenance of data and submission of cost reports in 42 C.F.R. §413.20(d).  In the instant case, the record shows that the Provider failed to submit adequate documentation.  While the Providers argued that such documentation involved private information and could not be included in the record, the Administrator notes that the Board has procedures for handling such documentation.

Thus, pursuant to the laws and regulations cited above, the Administrator finds that the Board is incorrect to state that charity care days used to calculate a Medicaid DSH payment may be included in the Medicare DSH calculation. The charity care days involve individuals who are not eligible for medical assistance under a State plan approved under Title XIX and, therefore, cannot be included in the numerator of the Medicaid fraction for purposes of the Medicare DSH calculation.

# DECISION

The decision of the Board upholding the Intermediary is affirmed, in accordance with the foregoing opinion.


## THIS CONSTITUTES THE FINAL ADMINISTRATIVE DECISION OF THE SECRETARY OF HEALTH AND HUMAN SERVICES


Date: 3/7/08

Herb B. Kuhn
Deputy Administrator
Centers for Medicare & Medicaid Services