UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COVENANT HEALTH SYSTEM, formerly d/b/a ST. MARY OF THE PLAINS HOSPITAL AND METHODIST HOSPITAL,<br><br>**Plaintiff,**<br><br>v.<br><br>KATHLEEN G. SEBELIUS, Secretary of the United States Department of Health and Human Services<br><br>**Defendant.** | Civil Action No. 08-cv-00828 (BJR)<br><br>ORDER GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGEMENT |

In this action, Plaintiff Covenant Health System ("Covenant") appeals the Secretary of the Department of Health and Human Service's (the "Secretary") final decision concerning the amount of Medicare payments due to Covenant for the fiscal years 1991 and 1993-1997. Currently before the court are Covenant's motion for summary judgment and the Secretary's cross-motion for summary judgment. (Dkt. Nos. 20 and 24.). Upon consideration of the relevant legal authorities, the parties' memoranda, and the entire record herein, and for the reasons discussed below, the court will grant the Secretary's cross-motion and deny Covenant's motion for summary judgment.

I.  BACKGROUND

   A.   *The Medicare Disproportionate Share Adjustment*

Medicare is a federally funded insurance program designed to cover older and disabled individuals. 42 U.S.C. § 1395 *et seq*. Medicare reimburses hospitals primarily

through the Prospective Payment System ("PPS") based upon what it would cost an efficient hospital to treat a patient with a given diagnosis. *In re Medicare Reimbursement Litig.*, 309 F.Supp.2d 89, 92 (D.D.C. 2004), *aff'd*, 414 F.3d 7, 8-9 (D.C.Cir. 2005). However, the Medicare statute adjusts the PPS reimbursement to account for hospital-specific factors that may make a provider's costs higher than average. 42 U.S.C. § 1395ww(d)(5). One such adjustment is the "Disproportionate Share Hospital" adjustment, by which the Secretary provides an additional payment to hospitals that "serve[ ] a significantly disproportionate number of low-income patients." 42 U.S.C. § 1395ww(d)(5)(F)(i)(I). This is known as the "Medicare DSH adjustment."[1]

Whether a hospital qualifies for a Medicare DSH adjustment, and the amount of the adjustment it receives, depends on the hospital's "disproportionate patient percentage," 42 U.S.C. § 1395ww(d)(5)(F)(v), which is determined by the Secretary pursuant to a statutory formula. 42 U.S.C. § 1395ww(d)(5)(F)(v)-(vii); 42 C.F.R. § 412.106(b). According to the formula, the disproportionate patient percentage is the sum of two fractions, 42 U.S.C. § 1395ww(d)(5)(F)(vi), commonly referred to as the

---

[1] Hospitals that serve a disproportionate number of low-income individuals may also qualify for an adjustment under the Medicaid statute. *See Univ. of Wash. Med. Ctr. v. Sebelius*, 634 F.3d 1029, 1031 (9th Cir. 2011). The Medicaid statute is a federal grant program that encourages states to provide certain medical services "on behalf of families with dependant children and [on behalf] of aged, blind, or disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services." 42 U.S.C. § 1396-1. The Secretary reimburses a state for the care of these individuals based on the "federal medical assistance percentage." *Id*. § 1396b(a)(1).While this is the primary form of Medicaid reimbursement, Medicaid also provides an adjustment for hospitals that serve a disproportionate number of low-income individuals (the "Medicaid DSH adjustment"). *Id*. § 1396r-4(a)(1). A state's Medicaid plan defines how hospitals receive Medicaid DSH adjustments. *Id*. This case primarily involves a Medi*care* DSH adjustment dispute. Nevertheless, several aspects of Medi*caid* DSH adjustment are relevant and will be discussed herein.

Medicaid fraction and the Medicare fraction, *see Jewish Hosp., Inc. v. Sec'y of Health & Human Servs.*, 19 F.3d 270, 272 (6th Cir. 1994).

The Medicare fraction is not at issue in this case. The Medicaid fraction, central to this case, is defined as:

> The fraction (expressed as a percentage), the numerator of which is the number of the hospital's patient days...which consist of patients who...were eligible for medical assistance under a State plan approved under subchapter XIX of [the Social Security Act], but who were not entitled to benefits under [Medicare], and the denominator of which is the total number of the hospital's patient days for such period.

42 U.S.C. § 1395ww(d)(5)(F)(vi)(II). "[A] State plan approved under [subchapter] XIX" is the State's "Medicaid" plan. 42 C.F.R. § 400.200. Therefore, the result of this adjustment is that a hospital receives a higher reimbursement per Medi*care* patient as it treats more Medi*caid* patients. *Id.* § 1395ww(d)(5)(F)(vi)(II). "Put simply, the more a hospital treats patients who are 'eligible for medical assistance under a State plan approved under [Medicaid],' the more money it receives for each patient covered by Medicare." *Adena Reg'l Med. Ctr. v. Leavitt*, 527 F.3d 176, 178 (D.C.Cir.2008) (quoting 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II)) (alteration in original).[2]

---

[2] Medicare DSH adjustments are initially calculated by a "fiscal intermediary"–typically an insurance company acting as the Secretary's agent. See 42 C.F.R. §§ 421.1, 421.3, 421.100-.128. A provider dissatisfied with the fiscal intermediary's determination may request a hearing before the Provider Reimbursement Review Board (the "Board"), an administrative body appointed by the Secretary. *See* 42 U.S.C. § 1395oo(a),(h). The Board may affirm, modify, or reverse the fiscal intermediary's award. Once the Board rules, the Secretary may affirm, modify, or reverse its decision. *See id.* § 1395oo(d)-(f). The Secretary has authorized the Administrator of the Centers for Medicare and Medicaid Services ("CMS") to act on her behalf in reviewing the Board's decisions, and the Administrator's review of a Board ruling is considered the final decision of the Secretary. *See* 42 C.F.R. § 405.1875. Providers may then challenge the Secretary's final determination in federal district court. *See* 42 U.S.C. § 1395oo(f).

### B. Texas' Charity Care Program

The State of Texas administers and funds its Medicaid program through the Texas Title XIX State Plan (the "Texas Medicaid Plan"). (Pl. Stat. of Facts, Dkt. No. 20 at ¶ 17; AR 14.).[3] In September 1993, the Texas Medicaid Plan was amended to provide reimbursement for inpatient charity care provided by qualified hospitals (the "Charity Care Program"). (*Id.* ¶ 17; AR 14, n. 28.). Pursuant to the terms of the amended plan, the State identifies and reimburses those hospitals that provide a disproportionate share of inpatient care to indigent patients.[4] (*Id.* ¶ 17.). In order to be eligible for charity care reimbursement, the hospital must have a charity care policy that meets a minimum set of criteria approved at the state and federal level, and provide care pursuant to that policy. (*Id.* at ¶¶ 17-19.).

Covenant operates two acute care facilities located in the State of Texas that provided services to charity care patients during the fiscal years 1991 and 1993-1997. (AR 35.). Neither hospital qualified as a Medicaid DSH hospital under the Texas State Medicaid Plan, and consequently, did not receive Medicaid DSH adjustment payments (*see* note 2, *supra*). (AR 17, n. 35.). However, the hospitals did receive payment for the services from Texas pursuant to the State's Charity Care Program.

Covenant sought to include the inpatients days associated with the charity care patients in its numerator for the Medicaid fraction of its Medi*care* DSH adjustment for

---

[3]   All citations to "AR" refer to the Administrative Record filed by the Secretary.

[4]   Indigent or "charity care" patients under the Texas Medicaid Plan are patients who are not eligible for Medicaid or Medicare, and who have no health insurance coverage or other source of third-party payment for medical services. (AR at 5 and 16 (quoting State of Texas Disproportionate Share Hospital Reimbursement for Hospitals Other Than State-Owned Teaching Hospitals, Provider Position Paper).).

the fiscal years 1991 and 1993-1997. The fiscal intermediary refused to do so, and thereby, reduced Covenant's Medicare DSH reimbursement for those years. (AR 285-330.). Covenant alleges that it was short-changed $484,243.[5] Covenant timely appealed to the Provider Reimbursement Review Board (the "Board") to determine whether the Fiscal Intermediary determined the hospitals' Medicare DSH adjustment in accordance with 42 U.S.C. § 395ww(d)(5)(F)(vi)(II). (AR 461-465.). The Board ruled that although the patients in the charity care program did not qualify for federal Medicaid, the patients did qualify for medical assistance under a State approved plan. (AR 3.).[6] The Secretary, through the Centers for Medicare and Medicaid Services ("CMS"), reversed the Board's decision. (AR 2-19.).

Covenant sought judicial review on May 13, 2008. (Dkt. No. 1.). On November 19, 2008, the matter was stayed pending a final judicial decision in *Adena Reg. Med. Ctr. v. Leavitt*, 527 F.3d 176 (D.C.Cir. 2008), *cert. denied, Adena Reg. Med. Ctr. v. Johnson*, 129 S.Ct. 1933 (2009). (Dkt. No. 11.). On July 8, 2009, after certiorari was denied in *Adena*, the parties notified the court that the matter could be resolved by summary judgment. (Dkt. No. 18.). The matter is now ready for review.

---

[5] The Secretary counters that it is not possible to estimate how much the Medicare DSH adjustment would have been had the charity care patients been included because Covenant failed to submit evidence of the charity care days in dispute. (AR 5.).

[6] The Board also found that Covenant presented no evidence of the charity days it was claiming and that there was no evidence in the record of Covenant's attempt to resolve the specific days prior to the hearing. (AR 4.). On review, CMS affirmed the Board's finding that Covenant failed to properly support its claim. (AR 17.).

## II.      DISCUSSION

### A.      Legal Standard

Summary judgment under Federal Rule of Procedure 56(c) is appropriate only if the moving party has shown "that there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "In ruling on cross-motions for summary judgment, the court shall grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed." *Muwekma Ohlone Tribe v. Kempthorne*, 452 F.Supp.2d 105, 113 (D.D.C. 2006) (quoting *Shays v. FEC*, 424 F.Supp.2d 100, 109 (D.D.C. 2009) (citation omitted)).

Pursuant to the Medicare statute, this court reviews the Secretary's decision in accordance with the standard of review set forth in the Administrative Procedure Act (the "APA"). *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994). The APA requires a reviewing court to set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "unsupported by substantial evidence." 5 U.S.C. § 706(2). "The scope of review is narrow and [the court] must not substitute its judgment for that of the agency." *Heartland Reg'l Med. Ctr. v. Leavitt*, 511 F.Supp.2d 46, 51 (D.D.C. 2007) (citing *Motor Vehicle Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). The court will therefore not disturb the decision of an agency that has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice

made." *MD Pharm., Inc. v. DEA*, 133 F.3d 8, 16 (D.C.Cir.1998) (alterations in original) (quoting *State Farm Mut. Auto Ins. Co.*, 463 U.S. at 43).

This deferential standard presumes the agency action to be valid, *Kisser v. Cisneros*, 14 F.3d 615, 618-19 (D.C.Cir.1994), and the burden of showing that agency action violates the APA falls on the plaintiff, *Diplomat Lakewood Inc. v. Harris*, 613 F.2d 1009, 1018 (D.C.Cir.1979). In conducting its review, the court takes special note of the tremendous complexity of the Medicare and Medicaid statutes, which adds to the deference due to the Secretary's decision. *Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1229 (D.C.Cir.1994).

When the action under review involves an agency's interpretation of a statute that the agency is charged with administering, the court applies the familiar two-step analysis outlined in *Chevron U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.*, 467 U.S. 837 (1984). Under the *Chevron* framework, the first step is determining whether Congress has spoken directly to the "precise question at issue," for if it has, "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43. When determining whether Congress has spoken to the "precise question at issue," courts must first "employ[ ] traditional tools of statutory construction." *Id.* at 843 n. 9. If, however, the statute is silent or ambiguous with respect to the specific issue, "the question for the Court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843.

B.   *Analysis*

This case turns on the meaning of the phrase "eligible for medical assistance under a State plan approved under subchapter XIX." 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II). The Secretary interprets this phrase to mean "patients who are eligible for federal Medicaid." Because the charity care patients at issue here were not eligible for federal Medicaid, the Secretary did not include the inpatient days associated with their care in the numerator of Covenant's Medicaid fraction. Covenant argues that the inpatient days should have been included in the numerator, and by failing to do so, the Secretary miscalculated its Medicare DSH adjustment. For the reasons discussed below, this court concludes that "eligible for medical assistance under a State plan approved under subchapter XIX" is unambiguously limited to individuals eligible for federal Medicaid. Thus, the Secretary properly excluded the inpatient days associated with the charity care patients from Covenant's Medicare DSH adjustment calculations.

This court's review of the Secretary's interpretation of the Medicare statute proceeds under the *Chevron* framework. The inquiry therefore starts with the statutory language. *See, e.g., Carcieri v. Salazar*, 555 U.S. 379, 129 S.Ct. 1058, 1063-64 (2009). The Medicare statute does not define "medical assistance," but the D.C. Circuit has held that these words "ha[ve] the same meaning" in the Medicare statute "as they have in the federal Medicaid statute," which does define the phrase. *Adena Reg'l Med. Ctr. v. Leavitt*, 527 F.3d 176, 179 (D.C.Cir. 2008); *see also*, *Univ. of Wash. Med. Ctr. v. Sebelius*, 634 F.3d 1029 (9th Cir. 2011) ("Indeed, given that the Medicare DSH adjustment counts patients who are eligible for "medical assistance' under subchapter XIX..., it is hard to imagine looking anywhere other that subchapter XIX for a definition of this critical

term."). Nothing in the context of the Social Security Act overcomes the "natural presumption that identical words used in different parts of the same act are intended to have the same meaning." *Univ. of Wash. Med. Ctr.*, 634 F.3d at 1034 (quoting *Atl. Cleaners & Dyers v. United States*, 286 U.S. 427 (1932)).

According to the Medicaid statute, "medical assistance" is "'payment of part or all of the cost' of medical 'care and services' for a defined set of individuals." *Adena*, 527 F.3d at 180 (quoting 42 U.S.C. § 1396d(a)). This defined group of individuals consists of patients who fall within one of thirteen categories of individuals to whom states may (or must) extend Medicaid benefits. *See* 42 U.S.C. § 1396d(a). Therefore, for an individual to be "eligible for medical assistance" for the purposes of the numerator of the Medicaid fraction, the individual must be eligible for Medicaid under the federal Medicaid statute. *Adena,* 527 F.3d at 179; *see also, Northeast Hospital Corp. v. Sebelius*, 699 F.Supp.2d 81, 90-91 (D.D.C. 2010) (agreeing with this interpretation of the phrase "eligible for medical assistance"); *Univ. of Wash. Med. Ctr.,* 634 F.3d at 1036 (same).

It is undisputed that the charity care patients at issue here do not come within one of the thirteen categories of individuals eligible for Medicaid. (*See* Dkt. No. 20, Pl. Mot. at 11 describing charity care patients as "patients who are not eligible for Medicaid or Medicare, and [who do not have] health insurance coverage or other source of third party payment for services provided."). Therefore, they cannot receive "medical assistance" as that phrase is defined in the Medicaid statute. *See* 42 U.S.C. § 1396d(a). Because "medical assistance" means the same thing in the Medicare statute as it does in the Medicaid statute, *Adena*, 527 F.3d at 179, these charity care patients are not, by

9

definition, "eligible for medical assistance" as that phrase is used in the Medicare DSH adjustment. As such, the Secretary properly excluded them from the numerator of Covenant's Medicaid fraction. *Id.* at 180; *see also, Northeast Hospital Corp.*, 699 F.Supp.2d at 88 ("It is undisputed that the charity care patients at issue here do not come within one of those thirteen categories of people eligible for Medicaid....Therefore, they cannot receive 'medical assistance' as that phrase is defined in the Medicaid statute."); *Ashtabula County Medical Center v. Sebelius*, 762 F.Supp.2d 1 (D.D.C. 2011) (charity care patients not eligible for medical assistance within the meaning of the Medicare statute, as such, they were properly excluded when calculating DSH reimbursement owed to plaintiffs); *Banner Health v. Sebelius*, 715 F.Supp.2d 142 (D.D.C. 2010) (decision of Secretary to exclude low-income patients from Medicaid fraction of the Medicare DSH adjustment was not arbitrary and capricious); *Univ. of Wash. Med. Ctr.*, 634 F.3d at 1036 (low-income patients properly excluded in calculating hospitals' Medicare reimbursement payments because patients were not eligible for medical assistance under Medicaid); *Cooper Univ. Hosp. v. Sebelius*, 686 F.Supp.2d 483 (D.C.N.J. 2009) (same).

Covenant unsuccessfully attempts to distinguish *Adena* from the present case by differentiating the Texas Charity Care Program from Ohio's charity care program at issue in *Adena*. Covenant alleges that there are three significant differences between the two programs. First, unlike Ohio's program, which was not part of Ohio's State Medicaid plan, the Texas Charity Care Program is incorporated into the Texas Medicaid State plan. Second, unlike the Ohio Medicaid State plan, which expressly precluded payment for services furnished to charity care patients, Texas' Medicaid State plan provided for

payments to hospitals for charity care and those payments were matched with federal Medicaid funds. Third, the Texas Charity Care Program payments were specifically for the cost of hospital services rendered to low-income patients who qualified for medical assistance. (*See* Dkt. No. 27 at 3.). The court will address each of these distinctions in turn.

Covenant observes that the Texas State Medicaid plan, which was approved by the Secretary, incorporated the Charity Care Program at issue here. Thus, Covenant argues, the Charity Care Program must be a part of Texas' Medicaid plan. But, the D.C. Circuit already rejected a similar argument in *Adena*. There the Secretary had "approved certain modifications" to Ohio's charity care program "as an amendment to Ohio's Medicaid plan." *Adena*, 527 F.3d at 178-179. Thus, the hospitals argued, "the regulation must be part of the Ohio Medicaid plan: Why else would the Secretary have approved the regulation as an amendment to that plan?" *Id*. at 179.

The *Adena* court dismissed this argument. It observed that Ohio was permitted "to determine DSH adjustments in its Medicaid program by reference to a hospital's compliance with the requirement...that a hospital provide charity care." *Northeast Hosp*., 699 F.Supp.2d at 91 (quoting *Adena*, 527 F.3d at 179). Having done so, Ohio was obligated to "submit the regulation to the Secretary for approval because the mechanism for providing DSH adjustment under Medicaid is part of Ohio's Medicaid plan, and the Secretary must approve that plan." *Id*. Nevertheless, the Court concluded, "[t]he Secretary's approval of [Ohio's charity care program] does not suggest in any way that [the charity care] patients receive care pursuant to the Ohio Medicaid plan." *Id.* The same

11

is the case here: the Secretary's approval of Texas' Charity Care Program does not mean that Texas' charity care patients receive treatment pursuant to Texas State Medicaid. *See Northeast Hosp.*, 699 F.Supp.2d at 91 (holding that the Secretary's approval of Massachusetts's charity care program did not mean that Massachusetts's charity care patients received treatment pursuant to Massachusetts's Medicaid State plan).

Covenant counters that Texas' Charity Care Program is incorporated to a far greater extent in the Texas Medicaid State plan than Ohio's program was in Ohio's Medicaid plan. This argument is unavailing. The *Adena* court gave no indication that its conclusion–that the Secretary's approval of a charity care plan is irrelevant–turned on the extent to which a State Medicaid plan incorporated its charity program. *Northeast Hosp.*, 699 F.Supp.2d at 92 (declining to adopt a rule whereby the nature of the treatment given to a state's charity care patients depends on the extent that the charity care program is incorporated into a state Medicaid plan).

Next Covenant argues that the Secretary paid federal Medicaid matching funds to Texas for the Charity Care Program that corresponded to the payments made by Texas to hospitals during that time. According to Covenant, "the Secretary has no authority to pay any Federal matching funds for anything other than 'medical assistance under the State plan." (Dkt. No. 27 at 6.). Therefore, in Covenant's view, because federal matching funds paid for the treatment of its charity care patients, the charity care patients must have received "medical assistance"... "under a State plan." (*Id*.). Having received such medical assistance, Covenant argues, the charity care patients were eligible for medical

assistance, and the Secretary therefore erred in excluding them from Covenant's Medicaid fraction.

The court is not persuaded. Even though federal Medicaid money may have subsidized the medical treatment received by Texas' charity care patients, their care still does not meet the definition of "medical assistance." Congress made itself clear: only patients who fall within the thirteen categories of individuals eligible for Medicaid benefits are "eligible for medical assistance." *Northeast Hosp.*, 699 F.Supp.2d at 89. Covenant admits that its charity care patients do not fall within these enumerated categories. *See* Dkt. No. 20 at 11. Because the charity care patients did not fit within the statutory classes of eligible individuals, the patients were not capable of receiving medical assistance as defined by Medicaid. *See Banner Health v. Sebelius*, 715 F.Supp.2d 142, 159 (D.D.C. 2010) (the fact that hospitals received federal matching funds for charity patients' care does not establish that the patients were eligible for medical assistance under Arizona Medicaid State plan); *Northeast Hosp.*, 699 F.Supp.2d at 90-91 ("[E]ven assuming that the federal [Medicaid DSH funds] specifically pay for the treatment of the Hospital's charity care patients...those charity care patients are not rendered 'eligible for medical assistance.'"); *Univ. of Wash. Med. Ctr.*, 674 F.Supp.2d at 1212 ("Just because a patient is counted for purposes of the Medicaid DSH payment does not mean that the patient is eligible for Medicaid benefits..."); *Cooper Univ. Hosp.*, 686 F.Supp.2d 483, 495 (D.N.J. 2009) (the fact that patients are "included when calculating the Medicaid DSH adjustment...does not make [them] beneficiaries of the Medicaid

program, any more than Medicaid patients are beneficiaries of the Medicare program simply because they were included in the Medicare DSH calculation.").

Covenant next seeks to distinguish *Adena* by arguing that, unlike Ohio's plan, Texas pays hospitals specifically for their costs of treating charity care patients. Thus, it contends, the charity care treatment must have been provided pursuant to the Texas Medicaid State plan. This same argument was rejected by *Northeast Hospital*:

> The Hospital seeks to distinguish *Adena* by arguing that, unlike Ohio's plan, [Massachusetts's Medicaid State plan] pays hospitals specifically for their costs of treating charity care patients. But even assuming that the [Massachusetts State] Medicaid DSH payments specifically compensate hospitals for their treatment of charity care patients, this alone does not distinguish *Adena*. The court in *Adena* supplied two reasons for its conclusion that Ohio's charity care patients did not receive care "pursuant to the state [Medicaid] plan," but nowhere suggested that both reasons were necessary to its conclusion. Thus, the fact that Ohio's charity care patients are not eligible for the state's Medicaid plan by itself established that those patients "do not receive care pursuant to the [state] Medicaid plan." As Massachusetts's charity care patients are not eligible for [the Massachusetts State Medicaid plan], then, they also do not receive care pursuant to the [it].

*Northeast Hosp.*, 699 F.Supp.2d at 91. Likewise, Texas' charity care patients are not eligible for its Medicaid plan. As such, they did not receive care pursuant to it.[7]

### III.   CONCLUSION

---

[7] The parties dispute whether Covenant submitted sufficient evidence to substantiate that it treated charity care patients. It is not necessary for the court to address this issue given that the court finds that the Secretary properly excluded the charity care patients from Covenant's Medicare DSH adjustment. In addition, in its motion, Covenant claims for the first time that it is entitled to receive "hold harmless" payments under a CMS program memorandum. Plaintiff did not properly preserve this issue for appeal. The "hold harmless" argument was not addressed by the Board. (AR 2-19.). Defendant pointed this out in its cross-motion and Covenant abandoned the argument. Accordingly, the court will not address this claim.

Based on the foregoing, the court finds that the Secretary properly excluded the charity care inpatient days from the numerator of Covenant's Medicaid fraction. Accordingly, it is HEREBY ordered that Covenant's motion for summary judgment is DENIED and the Secretary's cross-motion for summary judgment is GRANTED. The case will be DISMISSED.

Dated: October 24, 2011

_____
BARBARA J. ROTHSTEIN
UNITED STATES DISTRICT JUDGE